# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREWS FARMS, et al., | CASE NO. CV-F-07-0464 LJO DLB |
| Plaintiffs, | **ORDER ON PLAINTIFFS' CLASS CERTIFICATION MOTION** (Doc. 73, 98) |
| vs. | |
| CALCOT, LTD., EADIE AND PAYNE | |
| Defendants. | |

## INTRODUCTION

Pursuant to a notice filed on March 3, 2009, plaintiffs Andrews Farms and Greg Palla (collectively "Plaintiffs") move to certify a class action in this matter, pursuant to Fed. R. Civ. P. 23. Defendant Calcot, Ltd., Robert W. Norris (collectively "Calcot"), and Eadie and Payne, LLP, ("Eadie")(all defendants collectively referred to as "Defendants") opposed the motion separately on April 3, 2009. Plaintiffs replied on April 20, 2009. Plaintiffs seek to certify a class defined as follows:

> All persons who have been, are, or will be "members" of Calcot, marketing their cotton in the Calcot Seasonal Pool, who have taken Advances from Calcot upon delivering their cotton to Calcot and have had their interest deducted from their payments for such cotton and/or deductions and or charges for such secret losses for the costs of operating and maintaining Calcot from the proceeds of their cotton sales at any and all times since January 1, 1983 or otherwise had interest costs of the Palm Bluff Development deducted from their settlements for the sale of cotton.

Defendants argue that Plaintiffs are inadequate representatives, and the proposed class lacks numerosity, commonality and typicality. For the following reasons, this Court DENIES without prejudice Plaintiffs' motion to certify the class.

**BACKGROUND**

On January 31, 1007, Plaintiffs commenced this action in the Superior Court for the State of California, County of Kern. Defendants removed the action to this Court on March 23, 2007. Plaintiffs, proceeding on the second amended complaint, assert ten causes of action against Calcot, a cotton marketing cooperative, Robert Norris, President and Chief Executive Officer of Calcot, and Eadie and Payne, Calcot's accounting firm. Plaintiffs allege the following facts:

Calcot is a cotton marketing cooperative, organized under Chapter 1, Division 20 of the California Food and Agriculture Code. Currently, Calcot markets cotton in California, Arizona, New Mexico, and Texas. Members of Calcot enter into a Seasonal Marketing Pool by executing a Marketing Agreement. Paragraph 6 of the Marketing Agreement entered between Calcot and each of its members provides:

> CALCOT shall market cotton delivered by GROWER and there shall be deducted from the proceeds of sales thereof the cost of freight, insurance, storage, and any other expense incurred in handling, cotton, including all costs of operating and maintaining CALCOT, together with retains for the Cotton Revolving Fund and other fund or funds as provided for in the Bylaws concerning cotton.

Pursuant to the Marketing Agreement, Calcot advances the grower/members money when the grower delivers his or her cotton to Calcot's warehouse. The grower is paid an advance against the expected sales price of each bale of cotton ("Initial Advance"). As sales of the member's cotton are "booked" and receivables collected, a series of additional payments are made ("Progress Payments"), though the end of the fiscal year. At the end of the fiscal year, a final settlement is made, to pay the grower/member for the remainder of any sums not paid previously.

Calcot also employs a seasonal per unit qualified retains system. In each crop year in which a grower participates as a member of Calcot, the grower/member pays qualified retains of $4.00 per bale of cotton delivered. This amount is reached by a "primary retain" of $3.00 per bale and a "secondary retain" of $1.00 per bale. The funds Calcot retains from its members are returned five years later. When returning the seasonal per unit retains, Calcot sends this message to its members: "Your investment in Calcot, represented by these retains, has been used for working capital and for facilities as warehouses, offices, and cotton classing equipment. These vital elements of our total marketing program continue to work for your benefit."

Plaintiff Andrews Farms is a California general partnership, a cotton producer located in Merced County, California. Andrews Farms was a member of Calcot from 1978 through approximately 1985, 1996-97, and 1999-2001. In all of those years, Andrews Farms marketed and sold cotton as a member of the cooperative through the Calcot Seasonal Marketing Pool.

Plaintiff Greg Palla ("Mr. Palla"), d/b/a/ Greg Palla Farming Company, is a sole proprietorship and a cotton producer located in Kern County, California. Mr. Palla was a member of Calcot from 1980-2003 and in those years marketed and sold cotton as a member of the Calcot Seasonal Pool. Mr. Palla was a member of Calcot's Board of Directors from 1992-2002, and served on Calcot's Audit Committee.

Plaintiffs allege that Calcot abused the seasonal per unit retains system, and "saddled growers with secret retains in excess of $23,000,000 utilized to pay interests costs" for development of the Palm Bluffs property, costs unrelated to the handling and marketing of cotton. Since 1951, Calcot has owned land in Pinedale, an unincorporated county island located in northern Fresno, California. Calcot originally used the Pinedale location for cotton storage and warehousing. Plaintiffs allege that since 1980, Calcot "venture[d] into real estate development" which ended in "financial disaster." At that time, Calcot expanded its Pinedale property by acquiring adjacent properties as part of a speculative land development schedule. Calcot would demolish its cotton warehouse facilities and replace them with non-cotton related development on the 200+ acre area. This development in Pinedale became known as the Palm Bluffs Development. Calcot ceased its cotton warehousing operation at the Palm Bluffs location in 1997. Plaintiffs claim that Calcot has expended around $100,000,000 in developing and carrying the Palm Bluffs Development, and disguised $23,000,000 in its interest costs as interest costs incurred in the handling and marketing of members' cotton. Plaintiffs allege that Calcot, with the help of Eadie, improperly concealed and charged costs related to the Palm Bluffs Development to all members under the Marketing Agreement.

## ANALYSIS & DISCUSSION

### Fed. R. Civ. P. 23 Requirements

A class for the violations alleged in the complaint must satisfy Fed.R.Civ.P.23 ("Rule 23"). The burden is on the party seeking to maintain the class action to establish a prima facie showing of each of the elements of Rule 23 (a) prerequisites and the appropriate Rule 23(b) ground for a class action. Fed.

R. Civ. P. 23(b). Pursuant to Rule 23(a), all class actions must meet four prerequisites: (1) the impracticability of joining all members ("numerosity"); (2) the existence of common questions of law or fact ("commonality"); (3) typicality of the claims and defenses of the parties with respect to the proposed class ("typicality"); and (4) adequate representation of the proposed class by the parties before the Court ("adequacy of representation"). Fed. R. Civ. P. 23(a); *Stanton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003). In addition, the Court must find that at least one of the following three conditions of Rule 23(b) are satisfied:

(1) the prosecution of separate actions would create a risk of:

(a) inconsistent or varying adjudications or (b) individual adjudications dispositive of the interests of other members not a party to those adjudications;

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or

(3) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b).

Before certifying a class, the Court must conduct a "rigorous analysis" to ensure that the four requirements of Rule 23(a) are met and that the class fits within one of the three categories of Rule 23(b). *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364 (1982). Plaintiffs can meet this burden by "providing the Court with a sufficient basis for forming a 'reasonable judgment' on each requirement." *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir.1975), *cert. denied*, 429 U.S. 816 (1976). The movant's burden is to produce evidence by affidavits, documents or testimony establishing each Rule 23 requirement. A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. *Falcon*, 457 US at 161; *see also, In re Initial Public Offering Secur. Litig.*, 471 F.3d 24, 33 (2nd Cir. 2006) (Rule 23 requirements must be met, not just supported by "some evidence.")

### Rule 23(a) Requirements

### Numerosity

To satisfy the numerosity requirement, the class must be so numerous that joinder of all members

individually is "impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement includes no specific numerical threshold. The Court must examine the specific facts of each case. *General Tel.C. v. E.E.O.C.*, 446 U.S. 318, 330, 100 S.Ct. 1698 (1980). Generally, 40 or more members will satisfy the numerosity requirement. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2nd Cir. 1995), *cert. denied*, 515 U.S. 1122 (1995).

Plaintiffs contend that Rule 23(a)(1) is satisfied because: (1) the total number of potential members are "at least, in the several hundreds;" (2) the geographic dispersion of the potential class members covers two to four states; and (3) given the expense of litigation, complexity of the case, and amount of an individual's claim, individual class members may lack the ability or motivation to institute individual actions. Mr. Palla estimates that since 1982, there are at least 3300 present and former members of Calcot. Mr. Palla explains that there were about 3000 members in 1982 and 1200 members in 2002. Mr. Palla estimates that today, 60% of Calcot members are in Arizona, 25% in California, 10% in Texas, and 5% in New Mexico. Mr. Palla believes that there are currently around 600 Calcot members. Former Calcot CEO and President David Farley ("Mr. Farley") estimates that there were 1200 Calcot members in July 2003, in California and Arizona. In 2003, the price per bale averaged $300. A typical farmer produced between 1000 and 2000 bales of cotton. Mr. Farley believes that Calcot inappropriately charged less than $1 per bale of cotton to its members.

Defendants argue that Mr. Palla and Mr. Farley lack personal knowledge as to the number of current members, and move to strike those declarations. In addition, defendants argue that Plaintiffs fail to establish that there is a high percentage of class members that will ultimately come forward to pursue a claim. Defendants submit that at least one current member has voiced disagreement with the instant action, and no other members have indicated their willingness to be part of the lawsuit despite the creation of a website soliciting participation in the matter and Mr. Palla's television appearance expressing his position in this matter.

In reply, Plaintiffs point out that Calcot does not dispute that joinder of the potential class members would be "impracticable." Additionally, Calcot's declaration of Marci S. Cunningham ("Ms. Cunningham") establishes that in 1983 there were 3490 Calcot members, in April 2009 there are 1236 members, and between 1983 and 2009, there are an estimated 1236-3500 members. Moreover, Plaintiffs

argue that there is no federal requirement that Plaintiffs must prove that a high percentage of class members will ultimately come forward to pursue a claim.

Plaintiffs establish the numerosity requirement of Rule 23(a)(1). By declarations of Mr. Palla, Mr. Farley, and Ms. Cunningham, there are an estimated 1236-3500 former and present members of Calcot that are located in four states. Although Mr. Palla and Mr. Farley may lack personal knowledge of the number of present members, they establish in their declarations that they have personal knowledge of Calcot members for the years in which they were members, served on the Board of Directors, and/or served as CEO and President of Calcot. Ms. Cunningham, a current Calcot employee with personal knowledge of Calcot members, establishes that there are between 1236 and 3500 potential class members. A class of this size would make joinder difficult, inconvenient, and impracticable. *See Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964). In addition, Eadie's reliance on *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644 (1993) is misplaced. Eadie cites no federal authority to support its position that Plaintiffs must prove that a high percentage of class members will move forward to prove their claims. Accordingly, Plaintiffs satisfy the numerosity requirement of Rule 23(a)(1).

**Commonality**

To certify a class action, there must be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). A "common nucleus of operative facts" is usually enough to satisfy the commonality requirement. *Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992), *cert. denied*, 506 U.S. 1051 (1993). Although Rule 23(a)(2) requires that there be common questions of fact, factual differences are not fatal if common questions of law exist. *Like v. Carter*, 448 F.3d 798 (8th Cir. 1971), *cert. denied*, 405 U.S. 1045 (1972). Thus, Rule 23(a)(2) does not require that every or all questions of fact or law be common or identical. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-20 (9th Cir. 1998). However, where the claims of the class are so factually and legally distinct as to be completely separate, commonality is absent. *In re Life USA Holding*, 242 F.3d 136, 144-47 (3rd Cir. 2001).

Plaintiffs submit that based on the following legal and factual questions common to all class members, the commonality requirement is satisfied:

1. Whether defendants' interest costs for the Palm Bluffs Development were not

disclosed to the members and/or board of directors and, to the contrary, were concealed?

2. Whether the defendants had a legal fiduciary duty to disclose, or list in its annual reports, the existence of the interest costs arising from the Palm Bluffs Development in a fashion that disclosed all material information in a truthful fashion?

3. Whether the defendants' undisclosed interest costs arising from the Palm Bluffs Development were deducted, in whole or in part, from the settlement of members account for cotton as "the cost of freight, insurance, storage, and any other expense incurred in handling cotton, including all costs of operating and maintaining CALCOT" under the Marketing Agreement, paragraph 6 from January 1, 1983 to the present?

4. Whether the defendants' undisclosed interest costs arising from the Palm Bluffs Development could legally be characterized as "the cost of freight, insurance, storage, and any other expense incurred in handling cotton, including all costs of operating and maintaining CALCOT" under the Marketing Agreement, paragraph 6?

5. How much money, per member, of the defendants' undisclosed interest costs arising from the Palm Bluffs Development were included as "the cost of freight, insurance, storage, and any other expense incurred in handling cotton, including all costs of operating and maintaining CALCOT" under the Marketing Agreement, paragraph 6, and deducted from the proceeds of members who received advances and final settlement payments from January 1, 1983 to the present?

6. Whether the defendants, by including "interest charges" that were interest costs arising from the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales, breached their fiduciary duties owed to the members?

7. Whether the defendants, by including "interest charges" that were interest costs arising from the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales, defrauded members by leading members to reasonably believe that the only sums being deducted from members who took Advances under the Marketing Agreement were the "cost of freight, insurance, storage, and any other expense incurred in handling cotton?"

8. Whether the defendants, by including "interest charges" that were interest costs arising from the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales under the Marketing Agreements with the members, committed fraud on the members?

9. Whether the defendants, by including "interest charges" that were interest costs arising form the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales under the Marketing Agreements with the members, committed mail fraud?

10. Whether the defendants, by including "interest charges" that were interest costs arising form the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales under the Marketing Agreements with the members, committed wire fraud?

11. Whether the defendants committed mail fraud or wire fraud in connection with representations made concerning the growers' "retains"?

12. What categories and measures of damages are available to plaintiffs as a result of the defendants' actions in furtherance of including "interest charges" that were interest

costs arising from the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales under the Marketing Agreements?

13. Whether the defendants, by including as expenses "incurred in handling cotton" the secret interest costs arising from the Palm Bluffs Development as "costs of operating and maintaining" CALCOT, from the proceeds of members' cotton sales, breached the fiduciary duties owed to the members?

14. Whether the defendants, by including as expenses "incurred in handling cotton" the secret interest costs arising from the Palm Bluffs Development as "costs of operating and maintaining" CALCOT, from the proceeds of members' cotton sales, defrauded investors by leading members to reasonably believe that the only sums being deducted from members under the Marketing Agreement were the "cost of freight, insurance, storage, and any other expense incurred in handling cotton?"

15. Whether defendants, by including as expenses "incurred in handling cotton" the secret interest costs for Palm Bluffs Development as "costs of operating and maintaining" CALCOT, from the proceeds of members' cotton sales under the Marketing Agreements with the members, and by virtue of the fiduciary duty owed to the members, engaged in actions constituting constructive fraud?

16. Whether the defendant PAYNE is guilty of negligent misrepresentation?

17. Whether defendant PAYNE is guilty of intentional misrepresentation?

18. Whether the statute of limitations should be tolled and/or defendants estopped from raising the statute of limitations due the fiduciary duty owed to the members and their concealment of the wrongdoing from the members and Board?

19. Whether defendant CALCOT breached the membership and marketing agreement (contract) between CALCOT and the plaintiffs?

20. Whether defendants violated RICO?

21. Whether Calcot needs to account to plaintiffs and if so for how much?

Eadie argues that the proposed class lacks commonality of facts. Eadie contends that Plaintiffs' claims against Eadie are primarily based on the: (1) Marketing Agreements between growers and Calcot; (2) Eadie's alleged failure to provide annual reports; and (3) representations allegedly made by Eadie. Eadie points out that certain members received Eadie's annual reports, while others did not. In addition, Eadie's alleged representations were made to a select number of members at an annual meeting. Moreover, Eadie argues that since 1998, Calcot sold the Palm Bluffs Development in increments, which provided a benefit for those growers from 1998 to the present that members prior to 1998 did not have.

Calcot argues that Plaintiffs lack commonality because Greg Palla had the benefit of representations made through audited financials and at the annual shareholder meetings.

This Court finds that Plaintiffs satisfy the commonality requirement of Rule 23(a)(2). Plaintiffs

identify numerous legal and factual issues common to the proposed members of the class. Defendants do not dispute that the legal issues are common. Instead, defendants argue that Plaintiffs lack commonality based on factual diversions. Factual differences are not fatal, however, if common questions of law exist *Like*, 448 F.3d 798. Here, Plaintiffs have demonstrated that class members share legal questions, even if by divergent facts. In addition, proposed class share a common core of salient facts and the divergent facts are minimal. Accordingly, the commonality requirement of Rule 23(a)(2) is satisfied. *See Hanlon*, 150 F.3d at 1019-20.

**Typicality**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties be typical of the claims or defenses of the class." "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Typicality is determined by the violation alleged to have occurred. *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 2002). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id*.

Plaintiffs allege ten claims: (1) Fraud (against Calcot only); (2) Breach of Fiduciary Duty (against Calcot only); (3) Constructive Fraud & Deceit Based Upon Fiduciary Relationship (against Calcot only); (4) Accounting (against Calcot only); (5) Breach Of Contract (against Calcot only); (6) Fraud & Deceit-- Intentional Misrepresentation Of Material Fact (against Eadie only); (7) Negligent Misrepresentation (against Eadie only); (8) Violation Of Rico (18 U.S.C § 1962(b)) (against Calcot and Norris only); (9) Violation Of Rico (18 U.S.C. § 1962(a)) (against Calcot only); and, (10) Violation Of Rico (18 U.S.C. § 1962(c)) (against NORRIS only).

Calcot fails to argue that claims of the representatives differ from those of the proposed class members. Calcot argues that typicality does not exist because the reason that individual members joined Calcot vary and therefore, reliance on the alleged fraud will be different for every member of the putative class. Calcot points out that Mr. Palla marketed his cotton with Calcot because he believed it was a trustworthy organization, his father marketed cotton with Calcot, and of market performance. Calcot

fails to explain how the reason for joining Calcot defeats the typicality requirement or affects Plaintiffs' claims.

Eadie argues that Plaintiffs' positions are atypical to that of the potential class, because they are not part of the class they seek to represent. In addition, Eadie contends that there are significant differences in the alleged representations Eadie made to various parties, which affects each class members' demonstration of reliance on its alleged misrepresentations.

Plaintiffs establish typicality of the claims, pursuant to Rule 23(a)(3). Mr. Palla and Andrews Farms, as former Calcot members, are members of the proposed class, which is defined as persons who "have been, are, or will be 'members' of Calcot." The class representatives' claims are typical of the proposed class members. The representatives, and putative class members, claim that Calcot fraudulently charged interest related to the Palm Bluffs Development, in breach of the Marketing Agreement, and that such interest charges were made possible by Eadie's misrepresentations. While individual questions of reliance may exist, Plaintiffs demonstrate the "predominance of common questions over individual ones." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Accordingly, the typicality requirement of Rule 23(a)(2) is satisfied.

**Adequacy of Representation**

The person representing the class must be able "fairly and adequately to protect the interests" of all members in the class. Fed. R. Civ. P. 23(a)(4). The representation is "adequate" if the attorney representing the class is qualified and competent and the class representatives are not disqualified by interests antagonistic to the remainder of the class. *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978). The parties do not dispute the adequacy of class counsel. The Court's analysis, and the parties' arguments, focus on the adequacy of the class representatives.

A class may not be appropriate where the class representatives claim a different type of injury than that being asserted on behalf of the other class members. Plaintiffs' claims and the class claims must be so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *Falcon*, 457 U.S. at 157-58. A representative is not adequate if that party is antagonistic or has conflicts with other potential class members. *Amchen Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997). The class representative must not seek relief that favors some class members at the expense

of others. *Payne v. Travenol Labs., Inc.*, 673 F2d 798, 810-11 (5th Cir. 1992).

Calcot argues that the class representatives do not adequately represent the proposed class, because they have conflicting interests with the remainder of the class. Calcot contends that because it has not been extended insurance coverage in this matter, current members would be forced to finance any damages award by creating a special retain from current members, deducting additional funds from the sales proceeds per bale of cotton from current and prospective members, and/or stop revolving out past retains that current members are owed. Calcot contends that it would be placed at a competitive disadvantage if it were to increase the dollar amount per bale retain, which would negatively impact the current members' costs for selling their cotton. Furthermore, Calcot asserts that current members would be negatively impacted by a lowering of cash reserves that would increase the interest cost for Calcot's current member's line of credit.

Eadie similarly argues that the class representatives do not adequately represent the class, because the bulk of any recovery in this matter will be borne ultimately by current members. Eadie also points out that Calcot has no insurance. Eadie contends that any significant monetary damages recovered by Plaintiffs will be paid largely by potential members of the class, namely, current and future members. As a result, Eadie concludes, there is an inherent conflict of interest between the class representatives, who are former Calcot members, and potential class members who are current and future Calcot members.

In reply, Plaintiffs maintain that there is no conflict of interest between the class representatives and putative class members. Plaintiffs argue that the Calcot should not be allowed to use the harm from their conduct to avoid being held accountable. Moreover, Plaintiffs contend that Calcot's argument is predicated on the fact that the class representatives would be *too effective* in representing past and present members, in that they would advance the claims for all members aggressively and effectively thereby yielding a sizable amount in damages. Plaintiffs assert that the purported conflict is distinguished from the cases relied upon by defendants, because it has no nexus to any legal or factual issue that will be litigated. Plaintiffs suggest that in the unlikely event that a potential class member wishes to waive his or her claims, he or she may opt out of the class, but may not veto the ability of others to proceed with the class action. Plaintiffs argue that Eadie has no standing to assert claims on

behalf of Calcot, Eadie is insured up to $17,000,000, and Eadie is a joint tortfeasor. Plaintiffs assert that if one assumes that Plaintiffs' claims have merit, then present members would have no conflict in proceeding against the negligent accountants who caused their financial harm.

The following cases inform this Court's decision. In *Payne v. Travenol Labs*., 673 F.2d 798 (5th Cir. 1982), the court considered whether the class representatives, black females, could represent adequately a class that included black males in a mixed sex and race discrimination lawsuit. The district court narrowed the definition of the class based on the following:

> The conflict...is straightforward: the female plaintiffs asserted that Travenol discriminates against females by typically assigning them to the lower-paying jobs of assembler while typically assigning males to the higher-paying job of material handler. The females, therefore, sought to establish that males were favored at their expense. This claim plainly draws the interests of males into conflict with the interests of females.

*Id*. at 810-11. Because sexual discrimination was at issue in the case, the appellate court found that "black males are entitled to a class representative who is free from a desire to prove a claim that will impair their interests." In *General Telephone Co. of Northwest v. EEOC*, 446 U.S. 318, 331 (1980), the United States Supreme Court explained that the adequate-representation requirement "is typically construed to foreclose the class action where there is a conflict of interest between the named plaintiff and the members of the putative class." The Court expounded that the following situation would give rise to a conflict of interest under Rule 23:

> In employment discrimination litigation, conflicts might arise, for example, between employees and applicants who were denied employment and who will, if granted relief, compete with employees for fringe benefits or seniority. Under Rule 23, the same plaintiff could not represent these classes.

*Id*. The case most directly on point is *Amchen Prods. Inc.*, 521 U.S. 591, wherein the Court addressed a "sprawling" asbestos class action that attempted to settle all pending and future asbestos claims. The Court found that common issues of fact and law were lacking. In addition, the Court ruled that the class representatives did not represent the class adequately:

> [N]amed parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within a single class are not aligned. Most saliently, for the currently injured, the critical goal is general immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring ample, inflation-protected funds for the future.

*Id*. at 626. The Court rejected the settlement agreement as a "global compromise with no structural

assurance of fair and adequate representation for the diverse groups and individuals affected." *Id*. The Ninth Circuit Court of Appeals clarified that:

> at the heart of *Amchen* was concern over settlement allocation decisions; asbestos manufacturers had a designated amount of money that was not fairly distributed between present and future claimants. The *Amchen* settlement eliminated all present and future claims against asbestos manufactures, with class counsel attempted to represent both groups of plaintiffs. The Supreme Court found this dual representation to be particularly troubling, given that present plaintiffs had a clear interest in maximizing current funds, while future plaintiffs had a strong interest in preserving funds for their future needs and protecting the total fund against inflation.

150 F.3d at 1020-21.

*General Telephone* and *Amchen* illustrate that class representatives' interests must not be antagonistic to putative class members' pecuniary interests. To represent adequately a class, class representatives' interests must align with all putative class members' interests related to possible employment, fringe benefits, promotion, settlement allocation, and the recovery of damages. In this respect, *Amchen* is directly on point with the case at bar.[1]

A conflict of interest exists between the interests of the class representatives–both former Calcot members–and the interests of current and future Calcot members. As in *Amgen*, potential plaintiffs in this proposed class are divided into discrete, conflicting categories; namely, former Calcot members and current and future Calcot members. As Calcot and Eadie point out, significant monetary damages recovered by Plaintiffs may be paid largely by current and future Calcot members. Because former Calcot members do not bear that burden, they have an interest in maximizing the damages award. Conversely, current and future members of Calcot, who may have their damages awards offset by bearing the financial burden of paying for any damages awarded, may be interested to preserve Calcot's funds, even at the expense of their litigating claims. Because of this inherent conflict of interest, the class representatives cannot represent adequately the interests of current and future Calcot members.

The Court further considers that by testimony of the class representatives, no current Calcot member has expressed willingness to join this action. Mr. Andrews admits that his brother-in-law, a

---

[1] While *Amchen's* ruling related to the adequacy of representation is on point, the Court notes that this case is distinguishable from *Amchen* in that all potential class members have similar legal and factual issues, as discussed more fully above, to satisfy the commonality and typicality requirements of Rule 23.

current Calcot member, voiced disagreement with the instant action. Mr. Palla has spoken to a number of current Calcot growers about this lawsuit, but none, to his knowledge, have agreed affirmatively to join the litigation. Accordingly, Plaintiffs have not met their burden, by affidavits, documents or testimony, to establish the Rule 23(a)(4) requirement. *See, Falcon*, 457 US at 161.

"Ordinarily, if a court discerns a conflict like the one in this case, the proper solution is to create subclasses of persons whose interests are in accord." *Payne,* 673 F.2d at 812. This Court does not "'bear the burden of constructing subclasses' or otherwise correcting Rule 23(a) problems; rather, the burden is on Plaintiffs to submit proposals to the court." *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1239 (9th Cir. 2001) (quoting *United States Parole Comm. v. Geraghty*, 445 U.S. 388, 408 (1980)). In this Court's discretion, and in the interest of due process, this Court will allow Plaintiffs the opportunity to submit a further proposal, either to narrow the class definition or to propose subclasses. *See Geraghty*, 445 U.S. at 408 (after denying class certification, a district court must give the representative of the plaintiff an opportunity to propose subclasses, but has no obligation to construct them itself); *see also*, Fed. R. Civ. P. 23(c)(4),(5), and (d). Plaintiffs shall bear in mind that "each subclass must be headed by a person who claims the same injury as the subclass, but who lacks the fatal conflict." *Payne*, 673 F.3d at 812.

## Rule 23(b) requirements

As noted above, if Plaintiffs satisfy their burden under Rule 23(a), the Court must also find that at least one of the following three conditions of Rule 23(b) is satisfied:

(1) the prosecution of separate actions would create a risk of:
(a) inconsistent or varying adjudications or (b) individual adjudications dispositive of the interests of other members not a party to those adjudications;

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or

(3) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Plaintiffs propose certification under both Rule 23(b)(2) and 23(b)(3). "Where classwide litigation of common issues will reduce litigations costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino*, 97 F.3d at 1234. Because this Court finds that

14

plaintiffs did not satisfy their burden under Rule 23(a)(4), this Court need not analyze the parties' arguments related to Rule 23(b).

## **CONCLUSION**

For the foregoing reasons, this Court

1. DENIES without prejudice Plaintiffs' motion for class certification;

2. ORDERS Plaintiffs, no later than **May 21, 2009**, to file either:

    (a) a renewed motion for class certification, setting forth a proposal to overcome the Rule 23(a) conflict. In the event Plaintiffs file a renewed motion, the Court sets the following schedule:

        i. Plaintiffs, no later than **May 21, 2009**, shall file renewed motion.

        ii. Defendants, no later than **June 4, 2009**, shall file an opposition;

        iii. Plaintiffs, no later than **June 11, 2009**, shall file a reply, if any.

        iv. A hearing on the motion, if necessary, shall take place on Thursday, **June 18, 2009 at 8:15 a.m. in Courtroom 4 (LJO)**. The parties may appear telephonically by arranging a one-line call and calling (559) 499-5680; or

    (b) a statement that Plaintiffs no longer pursue class certification. In the event Plaintiffs no longer pursue class certification, this Court shall set a scheduling conference in this action.

IT IS SO ORDERED.

**Dated:   April 30, 2009**                    **/s/ Lawrence J. O'Neill**
                                                           UNITED STATES DISTRICT JUDGE