1

2

3

4

5

6

7                    **IN THE UNITED STATES DISTRICT COURT**

8              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9   ANDREWS FARMS, et al.,                    CASE NO. CV-F-07-0464 LJO DLB

10              Plaintiffs,                    **ORDER ON PLAINTIFFS' RENEWED CLASS CERTIFICATION MOTION AND DEFENDANTS' MOTION FOR SUMMARY**

11        vs.                                  **JUDGMENT** (Docs. 114, 120, 134)

12

    CALCOT, LTD., EADIE AND PAYNE,

13

              Defendants.

14   _____/

15                          **INTRODUCTION**

16          Pursuant to an amended notice filed on May 29, 2009, plaintiffs Andrews Farms and Greg Palla

17   (collectively "Plaintiffs") renewed a motion to certify a class action in this matter, pursuant to Fed. R.

18   Civ. P. 23.  Plaintiffs seek to certify a class defined as follows:

19          All persons or entities who, as of May 21, 2009, were former members of Calcot, who
            marketed their cotton in the Calcot Seasonal Pool, who have taken Advances from Calcot
20          upon delivering their cotton to Calcot and have had interest deducted from their
            payments for such cotton and/or deductions and or charges for such secret losses for the
21          costs of operating and maintaining Calcot from the proceeds of their cotton sales at any
            and all times since January 1, 1983 or otherwise had interest costs of the Palm Bluff
22          Development deducted from their settlements for the sale of cotton.  Specifically
            excluded from this definition are persons or entities who, as of May 21, 2009, were then
23          presently marketing their cotton with Calcot.

24   Defendants Calcot, Ltd. and Robert W. Norris ("Mr. Norris") (collectively "Calcot"), and Eadie and

25   Payne, LLP, ("Eadie")(all defendants collectively referred to as "Defendants") opposed the class

26   certification motion and Calcot moved for summary judgment in its favor, pursuant to Fed. R. Civ. P.

27   56.  For the following reasons, this Court DENIES Calcot's summary judgment motion and GRANTS

28   Plaintiffs' motion to certify the class defined above.

                                    1

1 <u>**Background**</u>

2    Plaintiffs assert ten causes of action against Calcot, a cotton marketing cooperative, Mr. Norris,

3 Calcot's President and Chief Executive Officer, and Eadie, Calcot's accounting firm.  Proceeding on

4 their second amended complaint ("SAC"), Plaintiffs allege the following facts:

5    Calcot is a cotton marketing cooperative, organized under Chapter 1, Division 20 of the

6 California Food and Agriculture Code.  Currently, Calcot markets cotton in California, Arizona, New

7 Mexico, and Texas.  Members of Calcot enter into a Seasonal Marketing Pool by executing a Marketing

8 Agreement.  Paragraph 6 of the Marketing Agreement entered between Calcot and its members provides:

9    CALCOT shall market cotton delivered by GROWER and there shall be deducted from
   the proceeds of sales thereof the cost of freight, insurance, storage, and any other expense
10   incurred in handling, cotton, including all costs of operating and maintaining CALCOT,
   together with retains for the Cotton Revolving Fund and other fund or funds as provided
11   for in the Bylaws concerning cotton.

12 Pursuant to the Marketing Agreement, Calcot advances the grower/members money when the grower

13 delivers his or her cotton to Calcot's warehouse.  The grower is paid an advance against the expected

14 sales price of each bale of cotton ("Initial Advance").  As sales of the member's cotton are "booked" and

15 receivables collected, a series of additional payments are made ("Progress Payments"), through the end

16 of the fiscal year.  At the end of the fiscal year, a final settlement is made, to pay the grower/member the

17 remainder of any sums not paid previously.

18    Calcot also employs a seasonal per unit qualified retains system.  In each crop year in which a

19 grower participates as a member of Calcot, the grower/member pays qualified retains of $4.00 per bale

20 of cotton delivered.  This amount is reached by a "primary retain" of $3.00 per bale and a "secondary

21 retain" of $1.00 per bale.  The funds Calcot retains from its members are returned five years later.  When

22 returning the seasonal per unit retains, Calcot sends this message to its members: "Your investment in

23 Calcot, represented by these retains, has been used for working capital and for facilities as warehouses,

24 offices, and cotton classing equipment.  These vital elements of our total marketing program continue

25 to work for your benefit."

26    Plaintiff Andrews Farms is a California general partnership, a cotton producer located in Merced

27 County, California.  Andrews Farms was a member of Calcot from 1978 through approximately 1985,

28 1996-97, and 1999-2001.  In all of those years, Andrews Farms marketed and sold cotton as a member

1   of the cooperative through the Calcot Seasonal Pool.

2        Plaintiff Greg Palla ("Mr. Palla"), d/b/a/ Greg Palla Farming Company, is a sole proprietorship

3   and a cotton producer located in Kern County, California.  Mr. Palla was a member of Calcot from 1980-

4   2003 and in those years marketed and sold cotton as a member of the Calcot Seasonal Pool.  Mr. Palla

5   was a member of Calcot's Board of Directors from 1992-2002, and served on Calcot's Audit Committee.

6        Plaintiffs allege that Calcot abused the seasonal per unit retains system, and "saddled growers

7   with secret retains in excess of $23,000,000 utilized to pay interests costs" for development of the Palm

8   Bluffs property, costs unrelated to the handling and marketing of cotton.  Since 1951, Calcot has owned

9   land in Pinedale, an unincorporated county island located in northern Fresno, California.  Calcot

10  originally used the Pinedale location for cotton storage and  warehousing.  Plaintiffs allege that since

11  1980, Calcot "venture[d] into real estate development" which ended in "financial disaster."  At that time,

12  Calcot expanded its Pinedale property by acquiring adjacent properties as part of a speculative land

13  development schedule.  Calcot would demolish its cotton warehouse facilities and replace them with

14  non-cotton related development on the 200+ acre area.  This development in Pinedale became known

15  as the Palm Bluffs Development.  Calcot ceased its cotton warehousing operation at the Palm Bluffs

16  location in 1997.  Plaintiffs claim that Calcot has expended around $100,000,000 in developing and

17  carrying the Palm Bluffs Development, and disguised $23,000,000 in its interest costs as interest costs

18  incurred in the handling and marketing of members' cotton.  Plaintiffs allege that Calcot, with the help

19  of Eadie, improperly concealed and charged costs related to the Palm Bluffs Development to all

20  members under the Marketing Agreement.

21        Plaintiffs initially moved to certify a class action on March 3, 2009.  On May 1, 2009, this Court

22  denied without prejudice Plaintiffs' motion. Order on Plaintiffs' Class Certification Motion ("Class Cert.

23  Order") (Doc. 113). Plaintiffs renewed the motion on May 21, 2009 and filed an amended renewed class

24  certification motion on May 29, 2009.  On June 15, 2009, Defendants opposed Plaintiffs' motion.  In

25  addition, Calcot moved for summary judgment.  Plaintiffs' replied to the class certification motion on

26  June 23, 2009 and opposed the summary judgment motion on July 24, 2009.  This Court finds these

27  motions suitable for decision without a hearing, vacates the August 12, 2009 hearing pursuant to Local

28  Rule 78-230(h), and issues the following order.

1

## ANALYSIS & DISCUSSION

2

### Summary Judgment Motion

3   Calcot moves for summary judgment on the grounds that Paragraph 6 of the Marketing

4   Agreement authorizes Calcot to finance its business operations, including deducting from grower

5   proceeds the interest costs related to Palm Bluffs Development.  Calcot argues that this Court should

6   consider the summary judgment motion before the pending class certification motion.  Prior to

7   certification, the Court has discretion to grant summary judgment as to some or all of the claims or

8   parties if the court is convinced it will save the parties time and expense. *Wright v. Schock*, 742 F.2d

9   541, 543–544 (9th Cir. 1984) ("It is reasonable to consider a Rule 56 motion first when early resolution

10  of a motion for summary judgment seems likely to protect both the parties and the court from needless

11  and costly further litigation.")  Summary judgments granted before certification is not res judicata as to

12  any member of the class other than the named representatives. *Wright*, 742 F.2d at 544.  Thus, the Court

13  has discretion to rule on the motion for summary judgment prior to the motion for class certification.

14

### Standard of Review

15  On summary judgment, a court must decide whether there is a "genuine issue as to any material

16  fact." Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A party

17  seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of

18  material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may satisfy

19  this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving

20  party's case; or (2) by demonstrating that the nonmoving party failed to make a showing of sufficient

21  evidence to establish an essential element of the nonmoving party's claim, and on which the non-moving

22  party bears the burden of proof at trial.  *Id*. at 322.  "The judgment sought should be rendered if the

23  pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

24  issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

25  P. 56(c).  "If the party moving for summary judgment meets its initial burden of identifying for the court

26  those portions of the material on file that it believes demonstrates the absence of any genuine issues of

27  material fact," the burden of production shifts and the nonmoving party must set forth "specific facts

28  showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*,

4

1   809 F.2d 626, 630 (9th Cir. 1987)(quoting Fed. R. Civ. P. 56(e)).

2       To establish the existence of a factual dispute, the opposing party need not establish a material

3   issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to

4   require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank*

5   *of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631.  The

6   nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answer

7   to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue

8   for trial." *Celotex*, 477 U.S. at 324.  Fed. R. Civ. P. 56(e) requires a party opposing summary judgment

9   to "set out specific facts showing that there is a genuine issue for trial.  If the opposing party does not

10  so respond, summary judgment should, if appropriate, be entered against that party."  "In the absence

11  of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly

12  supported summary judgment motion will be granted." *Nilsson, Robbins, et al. v. Louisiana Hydrolec*,

13  854 F.2d 1538, 1545 (9th Cir. 1988).

14                                   **Relevant Arguments**

15      Calcot argues, both as a defense to the motion for class certification and as a basis for summary

16  judgment, that it is authorized to deduct expenses of business operations pursuant to the Marketing

17  Agreement and pursuant to statute.  Paragraph 6 of the Marketing Agreement provides:

18          "Calcot shall market the cotton delivered by Grower and there shall be
            deducted from the proceeds of sales thereof the cost of freight, insurance,
19          storage **and any other expense incurred in handling cotton**, including
            all costs of operating and maintaining Calcot, together with retains for the
20          Cotton Revolving Fund and other fund or funds as provided for in the
            Bylaws concerning cotton. (Emphasis added.)
21

22  Calcot argues that the highlighted language in Paragraph 6 of the Marketing Agreement unambiguously

23  authorizes Calcot to deduct business operation and maintenance costs from cotton sale proceeds,

24  including interest costs for the Palm Bluffs development.  Calcot argues that since "the Pinedale

25  warehouse facility and adjacent properties were unquestionably Calcot's assets, it follows that

26  acquisition and development of the adjacent properties and maintenance of any related indebtedness falls

27  within the ambit of costs of operating and maintain Calcot."  (Doc. 136 Calcot's Moving papers, p.5.)

28

                                          5

1   Plaintiffs argue that procedural defects preclude the Court from considering defendant's motion

2   for summary judgment.  Plaintiffs argue that the motion is premature because merit-based discovery has

3   not yet taken place in the case.  Plaintiffs also argue that the motion violates the Court's Scheduling

4   Order because the Scheduling Order does not permit a motion for Summary Judgment and set dates

5   solely for class certification and certification discovery.

6   For the reasons set out below, the Court finds it unnecessary to address Plaintiffs' procedural

7   challenges to the motion for summary judgment.  As discussed below, the Court finds that Calcot has

8   not carried its burden on the motion.

9   **Rules of Contract Construction**

10   The mutual intention of the contracting parties at the time the contract was formed governs

11   interpretation.  Cal. Civ. Code, § 1636; *Palmer v. Truck Ins. Exchange,* 21 Cal.4th 1109, 1115, 90

12   Cal.Rptr.2d 647 (1999).  The Court must ascertain that intention solely from the written contract if

13   possible, but also consider the circumstances under which the contract was made and the matter to which

14   it relates. Cal. Civ. Code, §§ 1639, 1647.  The Court considers the contract as a whole and interprets its

15   language in context, rather than interprets a provision in isolation.  *Id.* § 1641.  The Court interprets

16   words in accordance with their ordinary and popular sense, unless the words are used in a technical sense

17   or a special meaning is given to them by usage.  *Id.* § 1644.  If contractual language is clear and explicit

18   and does not involve an absurdity, the plain meaning governs.  *Id.* § 1638.  Although interpretation of

19   a contract is essentially a judicial function, it is the jury's responsibility, as the trier of fact, to resolve

20   any conflicts in the extrinsic evidence properly admitted to interpret the language of a contract. *Dell'Oca*

21   *v. Bank of New York Trust Co., N.A.*, 159 Cal.App.4th 531, 71 Cal.Rptr. 3d 737 (2008), *as modified on*

22   *denial of reh'g*, (Feb. 22, 2008).  The rule that a writing free from ambiguity and uncertainty needs no

23   interpretation has been held applicable to co-operative marketing agreements. *Silveira v Associated Milk*

24   *Producers*, 63 Cal.App. 572, 219 P 461 (1923).

25   **Calcot's Articles of Incorporation and Calcot's By laws**

26   The authorized business of a corporation must be determined primarily from the provisions of

27   its charter or articles of incorporation. *Silveira*, 63 Cal.App. at 576.

28   Here, Calcot's Articles of Incorporation state the purpose of Calcot:

(A)     to promote, foster and encourage the business of marketing cotton, cotton seed, and other cotton products and by-products cooperatively and to eliminate speculative waste, and to stabilize the marketing of such products.

(B)     to engage in any activity in connection with the harvesting, ginning, grading, handling, processing, storing, warehousing, compressing, and marketing of cotton and cotton products and by-products of the Corporation and . . . and in the manufacturing, selling and furnishing to its members and non-members of supplies, and financing any of the above enumerated activities specified herein.

(Doc. 47, Exh. B to Norris Decl., Articles p. 39 of 87.)  In conjunction with the Articles of Incorporation, Calcot's Bylaws state the same purpose:[1]

"The purpose of the Association shall be to render service to its members at cost in connection with the members' agricultural pursuits within the limitations of the Cooperative Act.  Such services shall include (but shall not be limited to) marketing of members' products, handling or processing such products."  (Doc. 47, Exh. B to Norris Decl., Bylaws p. 42 of 87.)

"It is generally accepted that corporate bylaws are to be construed according to the general rules governing the construction of statutes and contracts." *Sanchez v. Grain Growers Ass'n of California*, 126 Cal.App.3d 665, 672, 179 Cal.Rptr. 459 (1981).  Bylaws must "be given a reasonable construction and, when reasonably susceptible thereof, they should be given a construction which will sustain their validity ...." *Id.*; *but see Reinert v California Almond Growers Exchange*, 9 Cal.2d 181, 70 P.2d 190 (1937) (court declined to attach controlling importance to the association's bylaws in construing the marketing agreement.)

Both the Articles and Bylaws contain provisions which state the purpose of Calcot as the marketing of members' products.  Activities within the purpose of Calcot include "any activity in connection with the harvesting, ginning, grading, handling, processing, storing, warehousing,

---

[1] Section 54111 of the Food and Agricultural Code requires such associations adopt a set of bylaws.  Cal.Food&Ag §54111 ("Each association shall, within 30 days after its incorporation, adopt for its government and management, a code of bylaws, not inconsistent with this chapter.")  The bylaws act as a contract with the members.  "The constitution and rules and by-laws of a voluntary unincorporated association constitute a contract between the association and its members, and the rights and duties of the members as between themselves and in their relation to the association, in all matters affecting its internal government and the management of its affairs, are measured by the terms of such constitution and by-laws." *American Soc. of Composers, Authors and Publishers v. Superior Court of Los Angeles County*, 207 Cal.App.2d 676, 689, 24 Cal.Rptr. 772, 780 (1962).

compressing, and marketing of cotton." (Doc. 47, Exh. B to Norris Decl., Articles p. 39.) The Bylaws identify that "agricultural pursuits" and the "marketing of members' products, handling or processing such products" are Calcot's functions. Likewise, the Marketing Agreement states "Calcot shall market the cotton delivered by Grower." (Marketing Agreement ¶6.)

To these ends, the Articles, Bylaws and Marketing Agreement are consistent with statutory authority. Cooperative associations find statutory authorization in the Cal.Food &Agr. Code §54001 et seq. for their purpose: "(a) Promote ... the intelligent and orderly marketing of agricultural products through cooperation; (b) Eliminate speculation and waste; ( c) Make the distribution of agricultural products between producer and consumer as direct as can be efficiently done; (and) (d) Stabilize the marketing of agricultural products." (§ 54031.) A nonprofit cooperative association may engage in any activity connected with the production, marketing, or selling of the products of its members. Food & Agr. Code, §§ 54061, 54171. It may concern itself with the harvesting, processing, or other use of such products, as well as the manufacturing of by-products. Cal. Food & Agr. Code, §§ 54061, 54171. And it may engage in the manufacturing, selling, or supplying of machinery, equipment, and supplies to its members. Cal. Food & Agr. Code, §§ 54061, 54171. An association may also finance any of the above activities, Cal. Food & Agr. Code, §§ 54061, 54171, borrow money without limitation and make advances to its members, Cal. Food & Agr. Code, § 54172 and act as the agent of its members with respect to these activities. Cal. Food & Agr. Code, § 54173.

These statutory provisions infer engaging in business unrelated to "marketing or selling members' products" is outside the permissible scope and inconsistent with members' agreements. Real estate development is not "any activity in connection with the harvesting, ginning, grading, handling, processing, storing, warehousing, compressing, and marketing of cotton." (Doc. 47, Exh. B to Norris Decl., Bylaws p. 39.) The Bylaws do not authorize the financing of real estate development of Calcot owned property. The Bylaws limit financing to "financing any of the above enumerated activities specified herein." (Doc. 47, Exh. B to Norris Decl., Bylaws p. 39.) Real estate development is not one of the enumerated activities.

Calcot argues that it is statutorily authorized to own and hold real estate pursuant to Cal. Food & Agr. Code §54176. Calcot argues that it may borrow money, buy and sell land, and enter into

1   contracts, within the meaning the Code which expressly permitted Calcot to enter into the agreements

2   for developing Palm Bluffs.  Calcot argues that it may develop and sell property and deduct costs from

3   sale proceeds according to Paragraph 6, the Code and the Bylaws which authorize Calcot to borrow

4   money, buy and sell property, and "make all other necessary and proper decision to achieve its business

5   objectives."  (Doc. 136, Calcot's Moving papers, p.2)

6           Pursuant to statute, an association may purchase real or personal property necessary for the

7   conduct of its business. Cal. Food & Agr. Code, § 54176 ("An association may buy, hold, and exercise

8   all privileges of ownership, over such real or personal property as may be necessary or convenient for

9   the conduct and operation of, or incidental to, any of the business of the association.")  Here, however,

10  neither the Articles of Incorporation, the Bylaws or the Marketing Agreement contain language which

11  directly addresses Calcot's ability to engage in real estate development.  There is no evidence which ties

12  the real estate development directly to the purpose of Calcot as stated in Calcot's Bylaws, Articles and

13  as authorized by applicable statutory provisions.  There is no evidence that the "business objectives" of

14  Calcot are anything other than cotton-related activities.  In short, the statutory language, the Articles of

15  Incorporation, and the Bylaws do not include development of real estate for non-cotton related activities.

16          As a general proposition, a co-operative farm or dairy association may not make charges and

17  deductions in excess of those specifically provided for in the marketing contract for its services in

18  handling its members' products. *See Silveira v Associated Milk Producers* , 63 Cal.App. 572, 219 P. 461

19  (1923); *California Bean Growers' Assoc. v Rindge Land & Nav. Co.,* 199 Cal. 168, 248 P. 658 (1926);

20  *Reinert v California Almond Growers Exchange*, 9 Cal.2d 181, 70 P.2d 190 (1937) (the co-operative

21  association may make only those charges and deductions provided for in its agreement with its

22  members); *California Prune & Apricot Growers, Inc. v Baker*, 77 Cal.App. 393, 246 P. 1081 (1926)

23  (marketing associations deducted from the total sum received from the sales of the crops charges in

24  excess of those provided by the marketing contracts).

25          In *Silveira v Associated Milk Producers*, 63 Cal.App. 572, 219 P. 461 (1923), the court did not

26  permit the association to deduct monies to provide a fund for the association to purchase lots and

27  buildings and agencies for distribution except as such distribution costs may be covered by the contract

28  provision.  The contract permitted the association to deduct charges for marketing the milk of its

9

members.  The association argued that a further clause in the agreement permitted it to make deductions for "causes beyond the control of the association." The court ruled that the clear and unambiguous terms of the contract did not purport to provide a fund for purchasing property and buildings for the carrying on of the business, and the court refused to add the terms through an interpretation of the contract.  "The association's claim, if good, must be supported by the language in the contract which is directly addressed to the moneys which it may withhold." The Court found that the contract did not even purport to provide a fund for purchasing lots and buildings or for the purpose of purchasing agencies for distribution.

An association may only make deductions from the amounts owed to their members as are permitted by the statute or contracts.  In *California Bean Growers' Ass'n v. Rindge Land & Navigation Co.*, 199 Cal. 168, 177 (1926), a broadly stated purpose in the association's articles permitted the association to charge costs of lobbying expenses in Congress.  The articles of incorporation provided that one of the purposes of the association was "to do each and every thing necessary, suitable, or proper, for the accomplishment of any of its purposes or attainment of any one or more of the objects herein enumerated, or which shall at any time appear conducive to or expedient for the interests or benefit of this association, in its proper activities, and to contract accordingly." The Court held that given such broad powers, "it cannot be said that the association exceeded its authority in the proper expenditure of a reasonable sum to procure favorable tariff legislation."

In *Reinert v California Almond Growers Exchange,* 9 Cal.2d 181, 70 P.2d 190 (1937), an association member sued for an accounting alleging that the association made improper deductions for reserves and working capital and other charges.  The by-laws permitted the amount of charges against members for "general expenses."  The by-laws authorized the association to deduct from the proceeds of sales the amount of expenses of operation, as well as those connected with preparing, packing, shipping and selling the almonds, and other charges "for other purposes advantageous to the general business of the [association]."  It was a question of fact as the propriety of the charges actually made. *Id.* at 187.  The Court ruled that the correct interpretation of the provision should not necessarily be determined from the language of the by-law alone but that, upon remand, the court should consider all admissible evidence concerning the issue and require the computation of charges to be made upon the

1    basis which the evidence shows is binding upon the parties.

2         Here, Calcot has not carried its burden that, as a matter of law, the language of the Marketing

3    Agreement, the Articles of Incorporation and the Bylaws permit it to charge members for functions

4    unrelated to handling of cotton.  The language of these documents do not demonstrate broad powers

5    outside of the handling of cotton. Therefore, Calcot has not carried its burden that acted within its

6    authority by engaging in real estate development.

7         Plaintiffs submitted various forms of parol evidence to assist in interpreting the contract by

8    determining the parties intent. The Court does not reach the parol evidence because it finds that Calcot

9    has not carried its burden.[2]

10                           **Class Certification Motion**

11        Because Calcot's summary judgment motion is denied, this Court next considers Plaintiffs'

12   amended renewed class certification motion.

13                          **Fed. R. Civ. P. 23 Requirements**

14        A class for the violations alleged in the complaint must satisfy Fed.R.Civ.P.23 ("Rule 23").  The

15   burden is on the party seeking to maintain the class action to establish a prima facie showing of each of

16   the elements of Rule 23 (a) prerequisites and the appropriate Rule 23(b) ground for a class action. Fed.

17   R. Civ. P. 23(b).  Pursuant to Rule 23(a), all class actions must meet four prerequisites: (1) the

18   impracticability of joining all members ("numerosity"); (2) the existence of common questions of law

19   or fact ("commonality"); (3) typicality of the claims and defenses of the parties with respect to the

20   proposed class ("typicality"); and (4) adequate representation of the proposed class by the parties before

21   the Court ("adequacy of representation").  Fed. R. Civ. P. 23(a); *Stanton v. Boeing Co.*, 327 F.3d 938,

22   953 (9th Cir. 2003).  In addition, the Court must find that at least one of the following three conditions

23   of Rule 23(b) are satisfied:

24   _____

25        [2] A passing statement made in Calcot's "Conclusion" in the moving papers indicates that Calcot believes a derivative
     action is the appropriate form of action for the instant case.  (Doc. 136, Calcot's Moving papers, p.9.)  This issue is not
26   properly before the Court for resolution and the Court does not reach it. Nonetheless, the Court notes that a derivative action
     is one filed on behalf of the corporation for injury to the corporation for which the corporation has failed or refused to sue.
27   *Schuster v. Gardner*, 127 Cal.App.4th 305, 311–312, 25 Cal.Rptr.3d 468, 473 (2005). Here, Plaintiffs sue, not for injury
     to Calcot, but for Plaintiffs' individual injury arising from Calcot's failure to pay money owed under the Marketing
28   Agreement.

(1) the prosecution of separate actions would create a risk of:

      (a) inconsistent or varying adjudications or (b) individual adjudications dispositive of the interests of other members not a party to those adjudications;

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or

(3) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b).

Before certifying a class, the Court must conduct a "rigorous analysis" to ensure that the four requirements of Rule 23(a) are met and that the class fits within one of the three categories of Rule 23(b). *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364 (1982). Plaintiffs can meet this burden by "providing the Court with a sufficient basis for forming a 'reasonable judgment' on each requirement." *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir.1975), *cert. denied*, 429 U.S. 816 (1976). The movant's burden is to produce evidence by affidavits, documents or testimony establishing each Rule 23 requirement. A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. *Falcon*, 457 US at 161; *see also, In re Initial Public Offering Secur. Litig.*, 471 F.3d 24, 33 (2nd Cir. 2006) (Rule 23 requirements must be met, not just supported by "some evidence.")

## Rule 23(a) Requirements

### *Numerosity*

To satisfy the numerosity requirement, the class must be so numerous that joinder of all members individually is "impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement includes no specific numerical threshold. The Court must examine the specific facts of each case. *General Tel.C. v. E.E.O.C.*, 446 U.S. 318, 330, 100 S.Ct. 1698 (1980). Generally, 40 or more members will satisfy the numerosity requirement. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2nd Cir. 1995), *cert. denied*, 515 U.S. 1122 (1995).

Plaintiffs contend that Rule 23(a)(1) is satisfied because the total number of potential members are "at least, in the several hundreds." Mr. Palla estimates that since 1982, there are at least 3300

1  present and former members of Calcot.  Mr. Palla explains that there were about 3000 members in 1982

2  and 1200 members in 2002.  Mr. Palla believes that there are currently around 600 Calcot members.

3  Former Calcot CEO and President David Farley ("Mr. Farley") estimates that there were 1200 Calcot

4  members in July 2003, in California and Arizona.  Calcot's declaration of Marci S. Cunningham ("Ms.

5  Cunningham") establishes that in 1983 there were 3490 Calcot members, in April 2009 there are 1236

6  members, and between 1983 and 2009, there are an estimated 1236-3500 members.

7      By declarations of Mr. Palla, Mr. Farley, and Ms. Cunningham, there are an estimated 1236-3500

8  former and present members of Calcot that are located in four states.  Mr. Palla and Mr. Farley establish

9  in their declarations that they have personal knowledge of Calcot members for the years in which they

10  were members, served on the Board of Directors, and/or served as CEO and President of Calcot.  Ms.

11  Cunningham, a current Calcot employee with personal knowledge of Calcot members, establishes that

12  there are between 1236 and 3500  past and current members.  Ms. Cunningham opines that there are

13  1236 present members.  Accordingly, based on these estimates, there are at least 2264 former Calcot

14  members who entered into the Marketing Agreement with Calcot during the relevant time period and

15  who participated in the Calcot Seasonal Pool.  A class of this size would make joinder difficult,

16  inconvenient, and impracticable.  *See Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14

17  (9th Cir. 1964).   Accordingly, Plaintiffs satisfy the numerosity requirement.

18                    *Commonality*

19      To certify a class action, there must be questions of law or fact common to the class. Fed. R. Civ.

20  P. 23(a)(2).  A "common nucleus of operative facts" is usually enough to satisfy the commonality

21  requirement.  *Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992), *cert. denied*, 506 U.S. 1051

22  (1993).  Although Rule 23(a)(2) requires that there be common questions of fact, factual differences are

23  not fatal if common questions of law exist. *Like v. Carter*, 448 F.3d 798 (8th Cir. 1971), *cert. denied*,

24  405 U.S. 1045 (1972).  Thus, Rule 23(a)(2) does not require that every or all questions of fact or law be

25  common or identical. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-20 (9th Cir. 1998).  However,

26  where the claims of the class are so factually and legally distinct as to be completely separate,

27  commonality is absent. *In re Life USA Holding*, 242 F.3d 136, 144-47 (3rd Cir. 2001).

28      Plaintiffs submit that based on the following legal and factual questions common to all class

13

members, the commonality requirement is satisfied:

1.    Whether defendants' interest costs for the Palm Bluffs Development were not disclosed to the members and/or board of directors and, to the contrary, were concealed?

2.    Whether the defendants had a legal fiduciary duty to disclose, or list in its annual reports, the existence of the interest costs arising from the Palm Bluffs Development in a fashion that disclosed all material information in a truthful fashion?

3.    Whether the defendants' undisclosed interest costs arising from the Palm Bluffs Development were deducted, in whole or in part, from the settlement of members account for cotton as "the cost of freight, insurance, storage, and any other expense incurred in handling cotton, including all costs of operating and maintaining CALCOT" under the Marketing Agreement, paragraph 6 from January 1, 1983 to the present?

4.    Whether the defendants' undisclosed interest costs arising from the Palm Bluffs Development could legally be characterized as "the cost of freight, insurance, storage, and any other expense incurred in handling cotton, including all costs of operating and maintaining CALCOT" under the Marketing Agreement, paragraph 6?

5.    How much money, per member, of the defendants' undisclosed interest costs arising from the Palm Bluffs Development were included as "the cost of freight, insurance, storage, and any other expense incurred in handling cotton, including all costs of operating and maintaining CALCOT" under the Marketing Agreement, paragraph 6, and deducted from the proceeds of members who received advances and final settlement payments from January 1, 1983 to the present?

6.    Whether the defendants, by including "interest charges" that were interest costs arising from the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales, breached their fiduciary duties owed to the members?

7.    Whether the defendants, by including "interest charges" that were interest costs arising from the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales, defrauded members by leading members to reasonably believe that the only sums being deducted from members who took Advances under the Marketing Agreement were the "cost of freight, insurance, storage, and any other expense incurred in handling cotton?"

8.    Whether the defendants, by including "interest charges" that were interest costs arising from the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales under the Marketing Agreements with the members, committed fraud on the members?

9.    Whether the defendants, by including "interest charges" that were interest costs arising form the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales under the Marketing Agreements with the members, committed mail fraud?

10.    Whether the defendants, by including "interest charges" that were interest costs arising form the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales under the Marketing Agreements with the members, committed wire fraud?

11.    Whether the defendants committed mail fraud or wire fraud in connection with representations made concerning the growers' "retains"?

14

12.     What categories and measures of damages are available to plaintiffs as a result of the defendants' actions in furtherance of including "interest charges" that were interest costs arising from the Palm Bluffs Development as "deductions" from the proceeds of members' cotton sales under the Marketing Agreements?

13.     Whether the defendants, by including as expenses "incurred in handling cotton" the secret interest costs arising from the Palm Bluffs Development as "costs of operating and maintaining" CALCOT, from the proceeds of members' cotton sales, breached the fiduciary duties owed to the members?

14.     Whether the defendants, by including as expenses "incurred in handling cotton" the secret interest costs arising from the Palm Bluffs Development as "costs of operating and maintaining" CALCOT, from the proceeds of members' cotton sales, defrauded investors by leading members to reasonably believe that the only sums being deducted from members under the Marketing Agreement were the "cost of freight, insurance, storage, and any other expense incurred in handling cotton?"

15.     Whether defendants, by including as expenses "incurred in handling cotton" the secret interest costs for Palm Bluffs Development as "costs of operating and maintaining" CALCOT, from the proceeds of members' cotton sales under the Marketing Agreements with the members, and by virtue of the fiduciary duty owed to the members, engaged in actions constituting constructive fraud?

16.     Whether the defendant PAYNE is guilty of negligent misrepresentation?

17.     Whether defendant PAYNE is guilty of intentional misrepresentation?

18.     Whether the statute of limitations should be tolled and/or defendants estopped from raising the statute of limitations due the fiduciary duty owed to the members and their concealment of the wrongdoing from the members and Board?

19.     Whether defendant CALCOT breached the membership and marketing agreement (contract) between CALCOT and the plaintiffs?

20.     Whether defendants violated RICO?

21.     Whether Calcot needs to account to plaintiffs and if so for how much?

Based on the common legal and factual issues identified above, Plaintiffs satisfy the commonality requirement of Rule 23(a)(2). As this Court previously ruled:

Plaintiffs identify numerous legal and factual issues common to the proposed members of the class. Defendants do not dispute that the legal issues are common. Instead, defendants argue that Plaintiffs lack commonality based on factual diversions. Factual differences are not fatal, however, if common questions of law exist. *Like*, 448 F.3d 798. Here, Plaintiffs have demonstrated that class members share legal questions, even if by divergent facts. In addition, proposed class share a common core of salient facts and the divergent facts are minimal. Accordingly, the commonality requirement of Rule 23(a)(2) is satisfied. *See Hanlon*, 150 F.3d at 1019-20.

Class Cert. Order, 8:28-9:7.

///

15

*Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties be typical of the claims or defenses of the class." "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Typicality is determined by the violation alleged to have occurred. *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 2002). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id*.

Plaintiffs allege ten claims: (1) Fraud (against Calcot only); (2) Breach of Fiduciary Duty (against Calcot only); (3) Constructive Fraud & Deceit Based Upon Fiduciary Relationship (against Calcot only); (4) Accounting (against Calcot only); (5) Breach Of Contract (against Calcot only); (6) Fraud & Deceit-- Intentional Misrepresentation Of Material Fact (against Eadie only); (7) Negligent Misrepresentation (against Eadie only); (8) Violation Of Rico (18 U.S.C. § 1962(b)) (against Calcot and Mr. Norris only); (9) Violation Of Rico (18 U.S.C. § 1962(a)) (against Calcot only); and, (10) Violation Of Rico (18 U.S.C. § 1962 (c) (against Mr. Norris only).

Mr. Palla and Andrews Farms are former Calcot members who are members of the proposed class, defined as persons who, *inter alia*, "were former members of Calcot, who marketed their cotton in the Calcot Seasonal Pool, who have taken Advances from Calcot upon delivering their cotton to Calcot and have had interest deducted from their payments for such cotton and/or deductions and or charges for such secret losses for the costs of operating and maintaining Calcot from the proceeds of their cotton sales at any and all times since January 1, 1983." As this Court previously ruled:

> The class representatives' claims are typical of the proposed class members. The representatives, and putative class members, claim that Calcot fraudulently charged interest related to the Palm Bluffs Development, in breach of the Marketing Agreement, and that such interest charges were made possible by Eadie's misrepresentations. Plaintiffs demonstrate the "predominance of common questions over individual ones." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Accordingly, the typicality requirement of Rule 23(a)(2) is satisfied.

Class Cert. Order, 10:9-15. Based on the foregoing, Plaintiffs establish typicality of the claims, pursuant to Rule 23(a)(3).

*Adequacy of Representation*

The person representing the class must be able "fairly and adequately to protect the interests" of all members in the class. Fed. R. Civ. P. 23(a)(4). The representation is "adequate" if the attorney representing the class is qualified and competent and the class representatives are not disqualified by interests antagonistic to the remainder of the class. *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978). Because the parties do not dispute the adequacy of class counsel, the Court's analysis focuses on the adequacy of the class representatives.

A class may not be appropriate where the class representatives claim a different type of injury than that being asserted on behalf of the other class members. Plaintiffs' claims and the class claims must be so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *Falcon*, 457 U.S. at 157-58. A representative is not adequate if that party is antagonistic or has conflicts with other potential class members. *Amchen Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997). The class representative must not seek relief that favors some class members at the expense of others. *Payne v. Travenol Labs., Inc.*, 673 F.2d 798, 810-11 (5th Cir. 1992).

Defendants argue that Plaintiffs are inadequate class representatives, because they were not members of the class during the defined period of time. Defendants point out that Andrews Farms has not been a member of Calcot for more than eight years and Mr. Palla has not been a member since 2003. Defendants' own authority, however, recognizes that named representatives need not be members of the class throughout the entire time period to be adequate representatives:

> A survey of decisional law indicates that a claimant can be an adequate class representative even if he purchased securities either at the commencement or at the termination of the relevant class period. [footnote omitted] Hence,... it is possible for a representative to purchase securities at either pole of the fraudulent interval...Furthermore, as a practical matter, counsel for plaintiffs has a substantial interest in demonstrating that [defendant's] alleged fraud and negligence extended over the entire class period because the success of the class as a whole will largely determine counsel's remuneration.

*In re U.S. Financial Sec. Litigation,* 69 F.R.D. 24, 38 (S.D. Cal. 1975). Similarly, although Andrews Farms and Mr. Palla were not Calcot members for the entire period, they are adequate representatives of the class so long as they were members at some point of the duration of the time period and their interests are not adverse to other class members.

1    Defendants contend that because the acquisition and liquidation of the Palm Bluffs Development

2    fluctuated from 1983-2009, the proposed class must be divided into three sub-classes: (1) from 1983-

3    1990, when Calcot was purchasing land in an effort to develop Palm Bluffs; (2) from 1990-1997, when

4    Palm Bluffs development activities were suspended due to an environmental litigation; and (3) from

5    2000-present, when Calcot was actively selling its Palm Bluffs properties.   Defendants' subclass

6    arguments fail to explain how Plaintiffs are inadequate class representatives, and Defendants fail to cite

7    legal authority to support their positions. Plaintiffs correctly note that Defendants' arguments relate to

8    differences in damages.   Differences in damages are generally raised to challenge the typicality

9    requirement, not to adequacy of representation, and do not preclude class certification.  *Trautz v.*

10   *Weisman*, 846 F. Supp. 1160, 1167 (S.D. N.Y. 1994) ("While the extent of damages may vary between

11   class members (due, at least in part, to the different lengths of time they spent at the facility), plaintiffs

12   claim differences among class members regarding damages are an insufficient basis to defeat class

13   certification."). Defendants' subclass arguments are better raised after the liability phase of this

14   litigation, and fail to establish that Plaintiffs are inadequate class representatives.

15   Defendants argue further that Plaintiffs are inadequate class representatives because they have

16   a "long-held antagonism toward Calcot." Defendants' argument unreasonably extrapolates that because

17   Plaintiffs feel they have been cheated, expressed more concern with recovering damages and have little

18   concern regarding the impact of this litigation on Calcot, then Plaintiffs "have little regard who, even

19   members of the potential class, pays the price."  Plaintiffs may have interests adverse to Defendants, a

20   position commonly held in our adverse legal system.  Defendants fail, however, to provide any evidence

21   to support the contention that Plaintiffs' interests are adverse to other putative class members.

22   Plaintiffs demonstrate that they are adequate representatives for the putative class members, as

23   the class is defined.  As discussed more fully above, Defendants do not establish that Plaintiffs have

24   interests that are antagonistic to other class members.  Accordingly, Plaintiffs satisfy their burden to

25   establish that they meet the Rule 23(a)(4) requirement.

26                                **Rule 23(b) requirements**

27   Because Plaintiffs satisfy their burden under Rule 23(a), the Court next considers whether

28   Plaintiffs satisfy at least one of the conditions of Rule 23(b). Plaintiffs propose certification under Rule

23(b)(3), which allows class certification when:

> the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Certification pursuant to Rule 23(b)(3) is appropriate "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon*, 150 F.3d 1022 (citing 7A Wright & Miller, *Federal Practice & Procedure* §1777 (2d ed. 1986)). To qualify for certification under this subsection, a class must satisfy two conditions: predominance and superiority.

The predominance requirement under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (citing *Amchen*, 117 S. Ct. at 2245). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on representative rather than on individual basis." *Id*. In this action, Plaintiffs establish that common questions present a significant aspect of the case. As set forth above, common questions of liability predominate this action. Individual questions relate almost exclusively to damages. As a result, Plaintiffs establish the Rule 23(b)(3) predominance requirement.

"Rule 23(b)(3) also requires that class resolution be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Hanlon*, 150 F.3d at 1023 (quoting Rule 23(b)(3)). In considering whether the class action is a superior method, this Court employs:

> a comparative evaluation of alternative mechanisms of dispute resolution. In this instance, the alternative methods of resolution are individual claims for a small amount of consequential damages or latch replacement. Further, the statute of limitations has run for owners of older vehicles under many state laws, and state lemon laws almost universally require that the vehicle be defective beyond repair - a condition which is impossible for many owners to demonstrate. Thus, many claims could not be successfully asserted individually. Even if efficacious, these claims would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs. In most cases, litigation costs would dwarf potential recovery. In this sense, the proposed class action is paradigmatic. A fair examination of alternatives can only result in the apodictic conclusion that a class action is the clearly preferred procedure in this case.

*Id*. For similar reasons, this Court finds that the class action is a superior method for a fair and efficient adjudication of this controversy. Plaintiffs have established that individual damages, if any, would be as little as less than one percent of each $350 bale of cotton per crop year. Bringing individual claims for small amounts of money would be inefficient and would discourage potential plaintiffs from seeking

1  redress for their claims.  In addition, because this alleged scheme spans over 25 years, plaintiffs may

2  have issues related to statute of limitations if they raised individual claims.  And because this class

3  proposes to include over 2000 members, individual actions would overburden this Court and strain

4  scarce judicial resources.  Accordingly, Plaintiffs satisfy the superiority requirement.

5  **Defendants' Further Opposition on Class Certification**

6  *Opt in vs. Opt Out*

7  Defendants propose that this Court employ an opt in, rather than an opt out, procedure in this

8  class action.  "Rule 23(c) contains a so-called 'opt out' requirement, mandating that members of a class

9  certified under Rule 23(b)(3) be afforded an opportunity to 'request exclusion from that class.'" *Estate*

10 *of Kern v. Siemens Corp.*, 393 F.3d 120, 124 (2nd Cir. 2004).  "Not only is an 'opt in' provision not

11 required, but substantial legal authority supports the view that by adding the 'opt out' requirement to

12 Rule 23 in the 1966 amendments, Congress *prohibited* 'opt in' provisions by implication." *Id.* (emphasis

13 in original); *see also, Phillips Petroleum Co. v. Shutts,* 474 U.S. 797, 812 (1985) (requiring class

14 members to opt in is not mandated by due process and would impede judicial efficiency); *Clark v.*

15 *Universal Builders, Inc.*, 501 F.2d 324, 340 (7th Cir. 1974) ("The requirement of an affirmative request

16 for inclusion in the class is contrary to the express language of Rule 23(c)(2)(b)").

17 Based on well-settled authority, this Court will employ an opt out procedure, as provided by Rule

18 23(c), and denies Defendants' request for an opt in class action.  Defendants may, however, raise a post-

19 liability request, pursuant to Fed. R. Civ. P. 23(d)(1)(B), for this Court to order addition notice to class

20 members to invite members to submit claims.

21 *Notice*

22 Plaintiffs have an obligation to notify all potential members with "the best notice that is

23 practicable under the circumstances, including individual notice to all members who can be identified

24 through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173

25 (1974).  The purpose of notice is to "present a fair recital of the subject matter of the suit and to inform

26 all class members of their opportunity to be heard. *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125

27 (9th Cir. 1977).

28 Plaintiffs submit their proposed documents to notify potential class members of this action, their

opportunity to be heard, and their rights.  Plaintiffs' draft notice is a 10-page document that sets forth basic information about this litigation, the claims, the definition of the class, the rights and options of the potential class members, information regarding the lawyers representing this action, and information about the trial process.  The draft notice directs potential class members to a website, www.cottonclassaction.com, for more information.  The website has case overview, a letter from Mr. Palla, information about the attorneys representing the class, information about the class action, a contact form to allow potential class members to contact the attorneys, and downloadable PDF version of the complaint.

Defendants argue that the notice must be revised because it is argumentative and unclear, and contains legal conclusions factual misstatements.  Plaintiffs agree to revise the notice and propose the parties meet and confer to discuss the notice issues.  In addition, Plaintiffs request limited discovery to determine whether Calcot has records with information about its members from 1983 through 2009. This Court orders the parties to meet and confer on this issues related to notice and discovery.  The parties shall raise any unresolved issues at the scheduling conference, as set forth below.

## CONCLUSION

For the foregoing reasons, this Court

1. DENIES Defendants' motion for summary judgment;

2. VACATES the August 12, 2009 hearing on that motion;

3. GRANTS Plaintiffs' motion for class certification;

4. CERTIFIES the class defined as follows:

> All persons or entities who, as of May 21, 2009, were former members of Calcot, who marketed their cotton in the Calcot Seasonal Pool, who have taken Advances from Calcot upon delivering their cotton to Calcot and have had interest deducted from their payments for such cotton and/or deductions and or charges for such secret losses for the costs of operating and maintaining Calcot from the proceeds of their cotton sales at any and all times since January 1, 1983 or otherwise had interest costs of the Palm Bluff Development deducted from their settlements for the sale of cotton.  Specifically excluded from this definition are persons or entities who, as of May 21, 2009, were then presently marketing their cotton with Calcot; and

5. SETS a scheduling conference on **August 31, 2009 at 9:15 a.m. in Courtroom 9 (DLB)**.  The parties shall file a joint scheduling report no later than August 24, 2009, to

include proposed scheduling dates and to brief any outstanding discovery and notice issues.  In addition, counsel should be prepared to discuss Magistrate Judge consent after they have consulted with their clients.  For further information related to the scheduling conference, the parties shall contact the chambers of United States Magistrate Judge Dennis L. Beck at (559) 499-5670.

IT IS SO ORDERED.

**Dated:**   **August 5, 2009**                              /s/ Lawrence J. O'Neill
                                                UNITED STATES DISTRICT JUDGE