# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREWS FARMS, et al., | CASE NO. CV-F-07-0464 LJO DLB |
| Plaintiffs, | **PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| vs. | |
| CALCOT, LTD., EADIE AND PAYNE, and ROBERT W. NORRIS, | |
| Defendants. | |

## Introduction

Plaintiffs Andrews Farms and Greg Palla and members of a class certified as described below (collectively "Plaintiffs") and defendants Calcot, Ltd ("Calcot"), Eadie and Payne ("Eadie") and Robert W. Norris ("Mr. Norris") (collectively, "defendants') move for a preliminary approval of settlement in this class action suit. To determine whether this class settlement fundamentally is fair, adequate and reasonable, this Court has considered the proposed settlement agreement between the parties, the relative strengths of the Plaintiffs' claims, the risks and expense involved in continuing litigation, the proposed expense for settlement administration, attorneys' fees, and representative enhancement, among other things. This Court has also reviewed the proposed Claim Form, Opt-Out Form, and Notice Form. For the following reasons, this Court GRANTS the parties' joint request for preliminary approval of the class action settlement. The Court SETS a fairness hearing to take place on **Tuesday, October 4, 2011 at 8:15 a.m. in Courtroom 4 (LJO)**. Any party wishing to present opposition, support, or comment at the October 4, 2011 hearing must file with this Court and serve to the parties a document setting forth the opposition, support, or comment no later than **Tuesday, September 20, 2011.**

# BACKGROUND[1]

## Relationship of Parties

Calcot is a cotton marketing cooperative, organized under Chapter 1, Division 20 of the California Food and Agriculture Code. Currently, Calcot markets cotton in California, Arizona, New Mexico, and Texas. Plaintiffs are a certified class defined as follows:

> All persons or entities who, as of May 21, 2009, were former members of Calcot who marketed their cotton with Calcot in the Seasonal Pool at any time between January 1, 1983 up to and including August 31, 2004 (the "Class Period"). Specifically excluded from this definition are: (1) any person who served as a member of Calcot's Board of Directors and/or served as an officer of Calcot at any time during the Class Period; (2) any persons or entities who as of May 21, 2009, were then presently marketing or selling their cotton or other products with Calcot; and (3) any persons or entities who fall within this definition but since May 21, 2009, have rejoined Calcot to market or sell their cotton or other products with Calcot.

Order On Defendants' Motion to Amend Class Certification (Doc. 261).

Members of Calcot enter into a Seasonal Marketing Pool by executing a Marketing Agreement. Paragraph 6 of the Marketing Agreement entered between Calcot and its members provides:

> CALCOT shall market cotton delivered by GROWER and there shall be deducted from the proceeds of sales thereof the cost of freight, insurance, storage, and any other expense incurred in handling, cotton, including all costs of operating and maintaining CALCOT, together with retains for the Cotton Revolving Fund and other fund or funds as provided for in the Bylaws concerning cotton.

Pursuant to the Marketing Agreement, Calcot advances the grower/members money when the grower delivers his or her cotton to Calcot's warehouse. The grower is paid an advance against the expected sales price of each bale of cotton ("Initial Advance"). As sales of the member's cotton are "booked" and receivables collected, a series of additional payments are made ("Progress Payments"), through the end of the fiscal year. At the end of the fiscal year, a final settlement is made, to pay the grower/member the remainder of any sums not paid previously.

Calcot also employs a seasonal per unit qualified retains system. In each crop year in which a grower participates as a member of Calcot, the grower/member pays qualified retains of $4.00 per bale of cotton delivered. This amount is reached by a "primary retain" of $3.00 per bale and a "secondary retain" of $1.00 per bale. The funds Calcot retains from its members are returned five years later. When

---

[1] These facts are taken largely from this Court's Order on Plaintiffs' Summary Judgment Motion, as restated in the parties' motion for preliminary approval.

2

1  returning the seasonal per unit retains, Calcot sends this message to its members: "Your investment in
2  Calcot, represented by these retains, has been used for working capital and for facilities as warehouses,
3  offices, and cotton classing equipment.  These vital elements of our total marketing program continue
4  to work for your benefit."

### Pinedale/Palm Bluffs Development

6   This action arises from Calcot's development of real estate formerly used to warehouse cotton.
7  Since 1951, Calcot has owned land in Pinedale, an unincorporated county island located in northern
8  Fresno, California.  Calcot originally used the Pinedale location for cotton storage and warehousing.
9  In1979, Calcot sought to relocate its warehouse facilities to the west of the Central Valley in response
10 to the shift of cotton acreage to areas west of Pinedale.  In addition, the City of Fresno was expending
11 north, close to the Pinedale.  Thus, Calcot's Board of Directors unanimously passed a resolution to
12 authorize Calcot management to sell or exchange the Pinedale plant and to build the necessary
13 replacement warehouses.

14  Calcot began expanding its Pinedale property by acquiring adjacent properties.  In August and
15 September1979, Calcot's Board of Directors approved the purchase of a telephone company property,
16 steel structure property and thirteen houses with frontage on Herndon Avene.  In 1980, Calcot re-
17 acquired parcels it has previously sold to control the frontage of the property along Herndon Avenue.
18 Calcot acquired these properties with the belief that doing so would make the property more sellable,
19 and would put Calcot in a better position to negotiate the sale of the Pinedale property.

20  In the 1980's, Calcot discovered that Pinedale's soil and groundwater was contaminated with an
21 industrial solvent known as trichloroethylene (TCE). The discovery of the environmental contamination
22 caused an abrupt halt and lengthy delay in Calcot's efforts to sell the property.  Calcot spent nearly ten
23 years investigating, monitoring, and litigating the environmental contamination.  Calcot recovered $4.3
24 million from Vendo Company, the source of the contamination, with an agreement that Vendo Company
25 would be responsible for further remediation of the area and underground aquifer.  Calcot also settled
26 with its former insurers for $4.5 million.

27  In 1997, Calcot renewed its efforts to sell the Pinedale property.  Calcot rjected offers made on
28 the property, as they were considered too low.  To add value, and with the intention to make the property

more profitable, Calcot's Board of Directors determined that Calcot would develop the land into a commercial development. The development in Pinedale became known as the Palm Bluffs Development. Calcot entered into an agreement with the City of Fresno that allowed the City to reimburse Calcot $7.5 million for improvements made to the property. The City issued Mello-Roos bonds to fund the infrastructure costs. Those infrastructure costs not covered by the Mello-Roos bonds were treated as expenses to the cooperative. Costs associated with the Pinedale and Palm Bluffs project were recorded in Calcot's audited financials, which were distributed annually to Calcot's Board of Directors and were available to a Calcot member upon request.

Calcot ceased its cotton warehousing operation at the Palm Bluffs location in 1997. The property was developed commercially. Some of the lots have been sold.

### Pinedale/Palm Bluffs Charges to Members

Plaintiffs allege that Calcot's "venture into real estate development" ended in "financial disaster." Plaintiffs claim that Calcot abused the seasonal per unit retains system, and "saddled growers with secret retains in excess of $23,000,000 utilized to pay interests costs" for development of the Palm Bluffs property, costs unrelated to the handling and marketing of cotton. Plaintiffs claim that Calcot has expended around $100,000,000 in developing and carrying the Palm Bluffs Development, and disguised $23,000,000 in its interest costs as interest costs incurred in the handling and marketing of members' cotton. Plaintiffs contend that Calcot, with the help of Eadie & Payne, Calcot's accounting firm, improperly concealed and charged costs related to the Palm Bluffs Development to all members under the Marketing Agreement. Plaintiffs contend that Calcot's charges, and concealment thereof, constitutes constructive fraud of a fiduciary and a breach of contract. Plaintiff demands damages and an accounting of the charges for the alleged fraud and breach of contract.

Grower/members of Calcot paid for some expenses related to the Pinedale/Palm Bluffs project. For example, Robert Norris ("Mr. Norris"), former CEO and President of Calcot who had direct responsibility for the project admitted that growers were charged for interest payments. In his deposition in connection with the Farley litigation, Mr. Norris testified as follows:

> Q. To the extent that interest payments are made which are expensed, that money comes out of what would otherwise be going into the grower's pocket that year, correct?

> A. That is no different than any other expense.
> Q. So is the answer yes?
> A. Yes. Yes.

Norris Depo., Volume II, p. 218. The Palm Bluff Development Status Update 25th Anniversary Review, prepared by Leo Dwyer ("Mr. Dwyer") on May 12, 2003 ("Dwyer Report"), contains an estimate of the costs Calcot charged to the Plaintiffs for the Palm Bluffs project throughout the 25 year time period. Mr. Dwyer notes that "[i]nterest carry was only charged to the project for two brief periods–once in the early80's and then again in the late 90's." Dwyer Report, p. 10; *see also*, Dwyer Report, p. 5. Mr. Dwyer then explains his opinion on how much Plaintiffs, as member growers during the relevant time period, paid for the Palm Bluffs project:

> To get an estimate of the carry cost paid by growers, I have taken the average of funds employed during each year and applied a cost of funds at the time interest rate–as conservative assumption given the risk involved in a land development project. I have then adjusted the "Implied cost of carry" to subtract out interest that was actually charged to the project (Capitalized again see page 5) as well as giving an additional credit because the $18m bond financing we received was actually borrowed at a rate below the prime rate.
>
> This result is an estimate of some $23.3m of interest paid by growers to carry the project over the 25 year period–including some $800k in FY '03 through the end of April.. [sic]
>
> In addition to the interest there have been some $.07m of project related expenses–real estate tax and association fees–paid by growers (As opposed to capitalized) in recent years.

Dwyer Report, p. 10. An April 7, 2003 email from Miguel Mory, assistant to Calcot's Treasurer/Chief Internal Accountant to Mr. Dwyer, reads:

> I asked Larry and he said that neither [Palm Bluffs Interest and RE Tax] is capitalized because they don't provide any future value. So in effect they are being expensed as operating expenses and consequently picked up by each year's pool. Miguel.

Calcot does not dispute that it charged its members for costs related to the Palm Bluffs project.

The evidence of the amount that was charged to the members varies. As set forth above, Mr. Dwyer's report estimates $23.3 million of interest in carrying costs and $.07 million in projected related expenses were paid by the growers. In a report critical of the Dwyer Report, Eadie & Payne audit partner John Prentice ("Mr. Prentice") concluded: "Dwyer's estimated carry cost of $23.3m may be overstated by 40%. That still leaves a carry of $14.0m. However, over the 23 years at a pool average of $597m per year (or $13.7b in total grower payment)s, the $14.0m is one tenth of 1%..." Memo from John

5

Prentice to Robert Dowd, Wegis Decl., Exh. L.  After

**Procedural History**

Plaintiffs initiated this action on January 31, 2007.  Plaintiffs proceed on their second amended complaint to allege ten causes of action against defendants: (1) fraud; (2) breach of fiduciary duty; (3) constructive fraud and deceit based on a fiduciary relationship; (4) accounting; (5) breach of contract; (6) fraud and deceit–intentional misrepresentation of material fact; (7) negligent misrepresentation; (8) violation of RICO (18 U.S.C. §1962(b)); (9) violation of RICO (18 U.S.C. §1962(a)); and (10) violation of RICO (18 U.S.C. §1962(c)).

After the removal of this action to federal court, a heavy law and motion practice ensued, including:  motions to dismiss complaint (filed April 11, 2007), motion to strike amended complaint (filed August 15, 2007), motions to dismiss amended complaint (file August 15, 2007), motion to certify class (filed March 3, 2009), renewed motion to certify class (filed May 21, 2009 and May 29, 2009), defendants' motion for summary judgment (filed June 15, 2009), plaintiffs' current motion for summary judgment (filed November 25, 2009), defendants' motion to alter the class certification (filed April 9, 2010); defendants' motion for permanent injunction and to decertify the class (filed July 26, 2010); and defendants' motion to disqualify class counsel (filed September 7, 2010).

The parties agreed to attend mediation, and attended mediation on September 8, 2010.  The mediation did not result in settlement.  A second mediation was held on February 23, 2011.  Although the parties found the second mediation to be fruitful, the case did not settle.  After further negotiations, the parties noticed the Court that settlement had been made on most claims.  The parties continued to work towards settling the details.

On May 5, 2011, the parties filed a notice of settlement with this Court, including the proposed settlement agreement (Docs. 324, 325).  Pursuant to that agreement, plaintiffs filed a motion for preliminary approval of settlement on June 7, 2011.  Calcot and Mr. Norris joined the motion June 8, 2011 and Eadie joined the motion on July 1, 2011.

**Settlement Agreement**

The relevant terms of the settlement agreement are as follows:

This is a global settlement agreement for a gross amount of $3,250,000 (the "Settlement Fund").

1  If approved at the fairness hearing, defendants will make contributions in the sum of $2,250,000 to the
2  Settlement Fund, administered by the Settlement Administrator, as soon as practical after the Final
3  Approval, but no later than thirty-five (35) days after Final Approval. "Final" mean (i) the date of final
4  affirmance on an appeal of the Final Approval; (ii) the date of final dismissal of any appeal from the
5  Final Approval; or (iii) if no appeal if filed, the expiration date of the time for filing or noticing any
6  appeal from the Final Approval. The Initial Contribution will be made as follows: Calcot: $1,000,000;
7  Mr. Norris: $750,000; and Eadie: $500,000. A second payment in the amount of $1,000,000 was agreed
8  to paid by Calcot in September 2012.

9  From the Settlement Fund, the following will be paid: (1) any award of attorneys' fees approved
10 by the Court, (2) any enhancement for the class representative approved by the Court, and (3) the fees
11 of the Settlement Administrator.  Class counsel seeks an award of attorneys' fees in the amount of
12 27.5% of the settlement amount.  Class counsel asks for an enhancement of $27,500 for the class
13 representative, Johnny Andrews ("Mr. Andrews"). The parties estimate fees paid to the Settlement
14 Administrator to be $250,000.

15 After these amounts are deducted, the Net Settlement Amount will be distributed as settlement
16 shares to all class members who submit valid claims. Class members will be compensated from the first
17 payment on a pro-rata basis. Class members should be eligible for distributions from the Net Settlement
18 Fund in the following approximate amounts per bale delivered to Calcot's seasonal pool:

20 | 1983: $.10 | 1984: $.13 | 1985: $.09 | 1986: $.07 | 1987: $.09 | 1988: $.09 | 1989: $.11 |
21 | 1990: $.12 | 1991: $.10 | 1992: $.10 | 1993: $.06 | 1994: $.07 | 1995: $.09 | 1996: $.10 |
22 | 1997: $.10 | 1998: $.14 | 1999: $.43 | 2000: $.49 | 2001: $.30 | 2002: $.09 | 2003: .03 |
23 | 2004: $.00 | | | | | | |

25 The parties estimate the class members' net recovery to be approximately one-third of the gross amount
26 of any damages assumed incurred if one accepts plaintiffs' theory of liability, varying somewhat from
27 year to year.

28 For claims between 1990 and 2003, inclusive, the bale count can be determined from Calcot's

records. Thus, Class Members will not be required to document claims during these years. Calcot does not have records of the volume of bales between 1983 and 1989. For Class Members who have claims between 1983 and 1989, inclusive, those members will be required to document their claims.

Any portion of the Net Settlement Fund not claimed by class members or any unused funds reserved for class administration shall revert to Calcot by payment from the Settlement Administrator.

**Settlement Administration**

The parties agreed to retain GCG, Inc. as settlement administrator. The costs incurred from the administration of Class Notice and Settlement shall be paid from the Settlement Fund. Defendants and class counsel shall, to the extent necessary for issues not addressed in the settlement agreement, meet and confer on the administration of the class. Any deviation from the contract shall be by mutual consent of the parties or by court order.

The settlement agreement provide that the class administrator shall provide to Class Counsel and Calcot an estimated "not to exceed" amount for the cost of administration. That sum shall be submitted in this motion for approval.

Jennifer M. Keough ("Ms. Keogh"), GCG, Inc. Executive Vice President, Operations, submits a declaration in support of this motion. Ms. Keogh declares that she has over 20 years of experience working in the legal field, managing complex projects and class administration. GCG, Inc. has served as administrator in over 2,500 cases and has sufficient experience in settlement administration.

Ms. Keough understands that settlement administration in this case involved the following activities:

1. Organizing and analyzing data, removing duplicate data, processing Class Members' last known addresses through the National Change of Address database to ensure the best available addresses for Settlement Notice mailing ("Class List"); and providing the Class List to the parties for approval prior to mailing;

2. Printing or arranging for the printing of the Settlement Notice, Proof of Claim Form, and Opt-Out Form ("Notice Packet");

3. Mailing or arranging for the mailing of the Notice Packet to Class Members;

4. Handling returned mail not delivered to Class Members, conducting advanced research

    to update address information for Class Members whose Notice Packers were returned, and making additional mailings in a timely manner;

5. Providing a toll-free telephone number dedicated to the administration of this Settleemnt that will provided pre-recorded approved messages and an opportunity to speak in a reasonably prompt manner with trained personnel who can responsed to Class Members' otherwise unanswered inquiries;

6. Administering a dedicated Settlement Website (www.cottonclassaction.com) to assist Class Members, including distribution information regarding the Settlement, Court proceedings, and other information necessary for Class Members to be apprised of their rights and interests in the Settlement;

7. Facilitating the Process by which Class Members may verify or correct their address or other identifying information;

8. Receiving, reviewing and processing Proof of Claim Forms and Opt-Out requests;

9. Reporting to the Parties and Court late claims, and possible processing and review of late forms;

10. Mailing deficiency notices to Class Members who Claims Forms are incomplete;

11. Answering written inquiries from Class Members and forwarding attorney-client communications to Class Counsel;

12. Maintaining a post-office box dedicated to this action;

13. Administering a Bank Account for the Settlement, including providing monthly reporting thereof;

14. Processing and mailing checks to authorized Claimants who qualify for settlement distribution;

15. Tracking and responding all returned mail, including returned or uncashed checks, and reissuing checks where appropriate;

16. Proving weekly and Quarterly Reports to the parties of Settlement statistics such as number of claims, opt-outs, class, website visit, distribution made from the Settlement Fund to Class Members, and other information available or requested;

     17.     Furnishing detailed monthly invoices to the Parties; and

     18.     Providing an affidavit to the Court about the integrity of the Settlement.

Ms. Keough estimates that costs for the above should not exceed $250,000.

In a supplemental declaration, Ms. Keough estimates that the cost of Settlement Administration will be between $135,000 and $150,000. Ms. Keough arrives at this estimate based on a number of assumptions, described in Exhibit C to her supplemental declaration. In addition, Ms. Keough's supplemental declaration presents a cost breakdown, specifying the estimated costs associated with each of the above-described aspects of the proposed Settlement Administration. This quote includes the costs of postage. The parties argue that because the estimate is based on a certain number of assumptions, which may prove to be incorrect, they have built in a 45% allowance for deviations which may occur. Accordingly, the parties submit that the "not to exceed" cost of $250,000 is fair, reasonable, and accurate.

Any disputes that arise regarding administration or enforcement of the terms of the settlement shall be submitted to the Court for resolution or, if the parties agree, to another neutral decision-maker.

**Claim Form, Opt-Out Form and Long Form Notice**

In support of this motion, the parties submit the following exhibits:

1. Claim Form–The proposed deadline is 80 days from the Fairness Hearing;
2. Opt-Out Form–The proposed deadline for returning the opt-out form is 40 days from the initial notice mailing date; and
3. Long Form Notice–The parties propose to include in the Long Form Notice that any Class Members who wish to present objections to the proposed settlement at the fairness hearing must do so in writing and be received by the court and the settlement administrator by at least 40 days from the initial mailing date.

The Court has reviewed these proposed documents. The parties request approval of these documents. The parties anticipate that it will take no more than two weeks for the Settlement Administrator, using Calcot's computerized records, to issue the three notices. The parties submitted a revised Long Form Notice on July 15, 2011, to address some of the Court's concerns.

///

## STANDARD OF REVIEW

"The court must approve any settlement...of the claims...of a certified class." Fed. R. Civ. P. 23(e)(1)(A). A settlement may be approved only after a hearing and on finding that it is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(1)(C). This approval is required to ensure that the settlement is consistent with plaintiffs' fiduciary obligations to the class. *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).

The determination of whether a class settlement is fundamentally fair, adequate and reasonable requires:

> a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993)). This list is non-exhaustive, and the Court may weight different factors depending on the circumstances of the case. *Id*.

## DISCUSSION

The Court shall consider the fairness, adequacy, and reasonableness of the proposed settlement pursuant to the aforementioned factors.

### Strength of Plaintiffs' Case

This Court has had the opportunity to consider the strength of plaintiffs' claims in the parties' multiple motions to dismiss and summary adjudication motions. The parties have established that neither is entitled to judgment as a matter of law on plaintiffs' claims. There are several disputed claims that a fact-finder must determine. There are weaknesses in both cases, as outlined below, and plaintiffs would be subject to substantial risk in pursing the claims to trial.

#### *Whether Calcot was Authorized to Charge Members*

Plaintiffs contend that charges related to the development of real estate are unauthorized because they are unrelated to the handling of cotton. Calcot argues that the costs of maintain the Pinedale property both were related to the handling of cotton and authorized by statute, its Bylaws, and Paragraph

6 of the Marketing Agreement. Several of plaintiffs' claims rest on how a fact-finder would determine this unresolved issue.

### *Whether Calcot improperly failed to disclose the charges*

The parties dispute whether Calcot's accounting practices of the carrying costs and related expenses constituted an improper non-disclosure. In addition, the parties dispute whether the charges related to the Palm Bluffs project were transparent. Plaintiffs assert that the non-capitalized interest expenses were not fairly disclosed, tracked or segregated on Calcot's books. In addition, Plaintiffs contend that the true financial performance of the Palm Bluffs project was never disclosed. Plaintiffs present evidence that the accounting of the carrying costs charged to the growers was not included in the Palm Bluffs' project accounting.

Calcot disputes that the accounting practices were improper. Calcot submits evidence that the accounting decisions were made on advice from their Eadie accountants. Moreover, Mr. Prentice of Eadie opines that:

> the accounting treatment of interest related to such a project conforms to Generally Accepting Accounting Principles (GAAP). GAAP indicates that interest incurred during the development phase of a project should be capitalized (but not to an amount greater than the fair market value of the project). Since the project was not undergoing development for many years, no capitalization was appropriate. Also under GAAP once a project is ready for sale, all interest is expensed.

An April 8, 2003 email from Miguel Mory to Mr. Dwyer explains that "the decision no[t] to capitalize the [interest and carry cost] expenses were made because the auditors felt the expenses did not have any future value." In addition, Calcot submits evidence that the actions of Calcot's Board of Directors related to the Pinedale/Palm Bluffs project were disclosed and approved by Calcot members each year. This issue, upon which plaintiffs' claims are based, is contested hotly and is an unresolved issue of fact.

### *Statute of Limitations*

Defendants maintain that the applicable statutes of limitations (3 years and 4 years) bar a significant portion of plaintiffs' claims, because the Pinedale project was widely known among its members and the members knew or should have known (based on the published annual reports and the board of directors' approvals) that the interest payments for the project were being paid from the funds. Plaintiffs argue that the information was concealed until it came to light in *Farley v. Calcot*, S-1500-CV-

251326 (Sup. Ct. Kern County) ("*Farley* litigation"). David Farley ("Mr. Farley") is a former Chief Executive Officer of Calcot. In the *Farley* litigation, Mr. Farley sued Calcot for wrongful discharge. Mr. Farley alleged, *inter alia*, that Calcot fired him under pre-text for advocating that the charges paid by the growers to carry the Pinedale/Palm Bluffs project should be disclosed. This Court has not yet addressed these statute of limitations issues. If resolved in defendants' favor, a significant portion of plaintiffs' claims would be barred.

### *Fraud and Deceit Based on Fiduciary Relationship*

Plaintiffs' third cause of action is styled "constructive fraud and deceit based on fiduciary relationship." Constructive fraud arises on a breach of a duty by one in a confidential or fiduciary relationship to another which induces justifiable reliance by latter to his prejudice. *Tyler v. Children's Home Society*, 29 Cal. App. 4th 511, 548 (1994). The "existence of a fiduciary relation is a question of fact which properly should be resolved by looking at the particular facts and circumstances of the relationship at issue." *Bear Stearns & Co. v. Daisy Sys. Corp.*, 97 F.3d 1171, 1178 (9th Cir. 1996). The "existence of a confidential or fiduciary relationship depends on the circumstances of each case and is a question of fact for the fact trier." *Kudokas v. Balkus*, 26 Cal. App. 3d 744, 750 (1990). The undisputed evidence demonstrates that there was a contractual relationship between the parties; however, questions of fact remain to establish a fiduciary relationship and the other essential elements of constructive fraud. Thus, whether Calcot failed improperly to disclose the carrying costs to the growers is a disputed material fact.

### *Accounting*

An accounting is an action in equity wherein the plaintiff seeks an unliquidated amount that cannot be determined or fixed without an accounting. *St James Church v. Superior Court*, 135 Cal. App. 2d 352, 359 (1955). The duty to account is part of the general duty of all agents. Savage v. Mayer, 33 Cal. 2d 548, 551 (1948). "[B]asic principles of the law of fiduciaries place the burden to render an accounting on the fiduciary once the principal has shown that funds have been entrusted to the fiduciary and not paid over or otherwise accounted form." *In re Niles*, 106 F.3d 1456, 1462 (9th Cir. 1997). The law of accounting relies on an agency or a fiduciary relationship, which is a question of fact. Accordingly, this claim against defendants is unsettled.

### *Breach of Contract*

Calcot has presented evidence to dispute material facts as to whether its Palm Bluffs Development activities and related charges were authorized. A finder of fact may conclude that based on the evidence and circumstances, the charges were authorized or cotton-related. Pursuant to statute, an association may purchase real or personal property necessary for the conduct of its business. Cal. Food & Agr. Code, § 54176 ("An association may buy, hold, and exercise all privileges of ownership, over such real or personal property as may be necessary or convenient for the conduct and operation of, or incidental to, any of the business of the association."). Calcot argues that the Pinedale project was necessary for the conduct of its business. In addition, although neither the Articles of Incorporation, the Bylaws or the Marketing Agreement contain language that directly addresses Calcot's ability to engage in real estate development, there is a question of fact as to whether the real estate development was tied directly to the purpose of Calcot as stated in Calcot's Bylaws, Articles and as authorized by applicable statutory provisions. A finder of fact may conclude that the costs of maintaining the Pinedale property through 1997 were related to the handling of cotton, as there was a cotton warehouse on that property at that time. A finder of fact may conclude that costs charged after 1997 were related to the handling of cotton, or were authorized as "costs of operating and maintaining CALCOT." Marketing Agreement, Paragraph 6. Accordingly, disputed issues of material fact exist on the breach of contract cause of action.

### *Conclusion*

Defendants have submitted evidence raising serious questions regarding the strengths of plaintiffs' case. While a fact-finder could find in favor of plaintiffs' on their claims, this factor supports a finding that the settlement is fair, adequate, and reasonable.

### **Risk, Expense, Complexity, and Likely Duration of Further Litigation**

This factor strongly favors preliminary approval of the class action settlement. This action has been hard-fought over four years, raising substantial attorneys' fees for all parties. In four years, the parties have not yet conducted formal discovery on the issues. The expense of discovery would be great, considering the large size of the class. The likely duration of further litigation would also be great. The parties would likely continue this action through a long trial and appeal.

### Risk of Maintaining Class Action Status Throughout the Trial

The parties submit no argument or evidence on this factor. This Court has no opinion of whether this factor supports preliminary approval. This factor is neutral.

### Extent of discovery completed and the Stage of the Proceedings

Based on the extent of discovery and the stage of proceedings, this Court finds that the proposed settlement agreement is fair, adequate and reasonable for the following reasons:

First, the Settlement Fund, which shall result in a net award of approximately one-third of the Class Members' claimed damages under plaintiffs' theory of the case, is reasonable and fair. The parties agree that this is a good faith approximation, given appropriate adjustments for the class size, actual interest rates, strength of the case, and related costs of litigation.

Second, while the parties have not engaged in formal discovery, substantial discovery was produced in the *Farley* litigation and relied on by the parties in this action. Moreover, the parties have produced discovery through the protracted law and motion litigation. Thus, the parties' interests, likelihood of success, and estimation of damages is informed.

Third, the Court finds no evidence that the settlement was the product of anything other than arm's length negotiations. All parties conducted extensive investigation and discovery, and the defendants have challenged class counsel multiple times through formal motions. In this contentious case, there is no evidence of any collusive negotiations between the parties.

### Experience and views of counsel

Class counsel submits a declaration to support this motion for preliminary approval of this class action settlement. Class counsel is an experienced attorney, particularly in class actions. Class counsel supports this settlement agreement. He outlines his opinion regarding the risks of continuing the litigation, including recovering a large sum of money from defendants, who have no insurance coverage, in the state of this economy. This factor supports preliminary approval of the settlement agreement.

### Reaction of the class members to the proposed settlement

No objections have been made by any class members. The class representative declares that he supports this settlement. This factor shall be revisited during and after the fairness hearing.

///

### Other Factors To Consider

#### *Attorneys Fees*

Class counsel request attorneys' fees in the amount of 27.5% of the Settlement Fund. The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000). Having considered the unopposed request, class counsel's separate motion for attorneys' fees, and the record, this Court finds the award to be reasonable.

#### *Named Representative Enhancement*

Class counsel requested a named representative enhancement of $27,500 for named plaintiff Johnny Andrews ("Mr. Andrews"). Defendants agreed not to oppose this request. The enhancement is to be paid from the Settlement Fund.

Mr. Andrews submits a declaration detailing the reasons for the request for an enhancement. One can measure the value of some of these reasons, including: (1) attendance at two full days of mediation (September 8, 2010 and February 23, 2011), including to and from Dos Palos, California to San Francisco for the mediation; (2) deposed for a day in Fresno, including travel, on February 24, 2009; (3) spending in excess of 12 hours discussing issues with counsel and staying abreast of developments; and (4) traveling at least once to Bakersfield to discuss the case. Mr. Andrews declares that he has incurred expenses in excess of $1200 related to travel and other expenses in this action.

Mr. Andrews also asks to be compensated because he has "reason to fear retaliation" due to his status as class representative. To support this assertion, he explains that his position as class representative has put a "wedge between his family," because his brother-in-law voiced his disagreement about pursuing this litigation and has stopped talking to Mr. Andrews. In addition, Mr. Andrews declares that on at least two dozen occasions, other individuals have come to him at public events and local eateries and questioned him in a critical fashion about why he is pursuing this litigation.

The Court requested the parties to provide supplemental briefing or declarations to substantiate an award of $27,500 as a class representative enhancement. The Court directed the parties to address how they arrived at the sum of $27,500 and why this sum–rather than a lesser sum of approximately $10,000–would remunerate Mr. Andrews adequately.

In response, class counsel submitted supplemental briefing. Class counsel revised the request to $10,000. Having considered the request, the record, and fairness of the request, this Court approves the request for $10,000 as a named representative enhancement for Mr. Andrews.

### *Settlement Administrator Fees*

In the Settlement Agreement, the parties agreed to submit a binding agreement between Calcot and the Class Administrator and/or a binding quote consisting of a "not to exceed" amount for the cost of class administration. Pursuant to the agreement, the parties submitted a declaration from Ms. Keough in which Ms. Keogh specifies the activities she expects GCG, Inc. shall perform to administer the class settlement. She then concludes that the "not to exceed" amount for the cost of class administration is $250,000.

This Court ordered supplemental briefing to support the "not to exceed" amount proposed by the settlement administrator. In its order for supplemental briefing this Court found:

> The "not to exceed" amount for the cost of class administration is not supported by Ms. Keough's declaration. For example, there is no mention of the estimated cost of the mailings, the estimated amount of mailing, the cost per hour and projected number of hours or the estimated about of people who will work on the class settlement administration, or the estimated cost per project (i.e., estimated costs for maintaining the toll-free number or the website). Ms. Keough makes this estimate "[b]ased on the experience and expertise given the work GCG has been advised to date that it will undertake in this Settlement[.]" This is insufficient to support the Settlement Administrator Fees. Without this information, this Court cannot determine whether this amount is excessive. Accordingly, the parties are ordered to submit supplemental declarations to support this request and this amount.

Order for Supplemental Briefing, p. 2.

The parties filed supplemental briefing on this issue on July 13, 2011, including a supplemental declaration by Ms. Keough. As set forth more fully above, explains sufficiently how she arrived at her estimate of a total Settlement Administration cost of between $135,000 and $150,000. The estimated costs appear to be reasonable and based on reasonable assumptions. In addition, the parties' cushion built into the "not to exceed" cost appears reasonable. Accordingly, this Court APPROVES the Settlement Administration estimated costs and "not to exceed" estimate.

### *Long Form Notice*

This Court asked the parties to address certain issues by supplemental briefing related to the Notice. First, the first page of the Long Form Notice had a formatting issue that needed to be addressed.

The parties have submitted a corrected copy of this Notice, which demonstrates that this issue has been corrected. Second, the parties' Notice refers to a Spanish language translation of the notice. This Court informed the parties that it requires a declaration that the Notice was translated by a certified court interpreter and, other than language, and was an accurate translation of the Court-approved English version of the Long Form Notice. The parties agree to submit that declaration and ask to submit it five days after the date that the Notice is approved by this Court. **For good cause appearing, the Court orders the parties to submit that declaration no later than July 25, 2011.**

The Long Form Notice will need to be modified after approval. For example, the Notice will need to be modified to include the several dates set by this Order, including the date of the Fairness Hearing and the date the Claim Forms, Opt-Out Forms, and opposition, comment, or support statements are due. In addition, the Long Form Notice shall be modified to include the Court's approval of the named representative enhancement, attorneys' fees, and Settlement Administration**. This Court GRANTS preliminary approval of the Long Form Notice, and ORDERS the parties to submit a modified and final version of the notice no later than July 25, 2011 for this Court's final approval.**

## **CONCLUSION and ORDER**

For the foregoing reasons, this Court ORDERS as follows:

1. The parties' proposed settlement agreement ("Settlement Agreement") is GRANTED preliminary approval, as it meets the criteria for preliminary settlement approval. The Settlement falls within the range of possible approval as fair, adequate, and reasonable, and appears to be the product of arm's-length and informed negotiations and to treat all Class Members fairly.

2. The parties' proposed notice plan is APPROVED. Individual notices shall be mailed to all class members whose identities are known to the parties, and such notice, as described in the Settlement Agreement and in the parties' memorandum and attached exhibits, is the best notice practicable. The parties' proposed Claim Form, Opt-Out Form, and Long Form Notice (collectively, "Class Notice Packet") are sufficient to inform Class Members of the terms of the Settlement, their rights under the Settlement Agreement, their rights to object to the settlement, their right to receive a Settlement Share or elect

1  not to participate in the Settlement, and the processes for doing so, and the date and
2  location of the final approval hearing.
3  3. The Class Notice Packet shall be disseminated according to the notice plan described in
4  the Settlement Agreement and in the form submitted by the parties and approved by this
5  Court.
6  4. GCG, Inc. is APPOINTED to act as Settlement Administrator, pursuant to the terms set
7  forth in the Settlement Agreement.
8  5. Calcot is DIRECTED to provide the Settlement Administrator with the records related
9  to the Class Members names and addresses **no later than August 2, 2011.**
10  6. The Settlement Administrator is DIRECTED to mail the approved Class Notice Packet
11  by first-class mail to the Class Members no later than **August 9, 2011.**
12  7. Costs of settlement administration shall not exceed $250,000.
13  8. Any Class Member who submits a timely and valid Claim Form no later than **September
14  20, 2011** shall receive a Settlement Share.
15  9. Any Class Member who wishes to opt-out of this settlement shall postmark the Opt-Out
16  Form no later than **September 20, 2011**;
17  10. A Final Approval and Fairness Hearing is SET for **Tuesday, October 4, 2011 at 8:15
18  a.m. in Courtroom 4 (LJO)**. At this hearing, the Court shall determine whether the
19  Settlement should be granted final approval as fair, reasonable, and adequate as to the
20  Class Members. The Court shall hear all evidence and argument necessary to evaluate
21  the Settlement and other motions and requests, described below. Class Members and
22  their counsel may support or oppose the Settlement, if they so desire, as the October 4,
23  2011 Fairness Hearing.
24  11. The class representative enhancement request, paid to plaintiff Johnny Andrews, d/b/a
25  Andrews Farms is GRANTED preliminarily in the amount of $10,000. Class Members
26  and their counsel may support or oppose this request, if they so desire, at the October 4,
27  2011 Fairness Hearing.
28  12. Class Counsel's motion for attorneys' fees, requesting 27.5% of the Settlement Amount

|   |   |   |
|---|---|---|
| 1 |     | plus costs is GRANTED preliminarily. Class Members and their counsel may support |
| 2 |     | or oppose this request, if they so desire, at the October 4, 2011 Fairness Hearing. |
| 3 | 13. | Class Members may appear at the October 4, 2011 Fairness Hearing in person or by his |
| 4 |     | or her own attorney, to show cause why this Court should not approve the Settlement |
| 5 |     | Agreement, or to object to the motion for attorneys' fees or class member representative |
| 6 |     | enhancement award. For comments or objections to be considered at the hearing, the |
| 7 |     | Class Member must file comments with the Clerk of this Court indicating briefly the |
| 8 |     | nature of the Class Member's comments, support, or objection. Such comments must |
| 9 |     | be filed with the Court, and mailed to Class Counsel, no later than **September 20, 2011.** |
| 10 | 14. | The Court reserves the right to vacate the October 4, 2011 Fairness Hearing if no |
| 11 |     | comments or objections are filed with this Court on or before September 20, 2011. |
| 12 | 15. | The Court reserves the right to continue the date of the Fairness Hearing without further |
| 13 |     | notice to the Class Members. The Court retains jurisdiction to consider all further |
| 14 |     | applications arising out of or in connection to the Settlement Agreement. |

IT IS SO ORDERED.

**Dated:   July 18, 2011**                            /s/ Lawrence J. O'Neill
                                                      UNITED STATES DISTRICT JUDGE